**MAUD VAN WOY v. P. L. WILLIS, et al.**

14 So. (2nd) 185                                    June Term, 1943
June 18, 1943                                        Division A

*McCarthy, Bond & Lane, Edward McCarthy, Jr.,* and *J. Franklin Garner,* for appellant.

*Milam, McIlvane & Milam,* for appellees.

CHAPMAN, J.:

The Circuit Court of Palm Beach County, Florida, sustained a motion to dismiss the amended bill of complaint, in the case at bar, thereby holding that the allegations thereof were legally insufficient to support a decree for the relief prayed. The plaintiff declined to file a second amended bill of complaint and the amended bill was dismissed and an appeal therefrom perfected to this Court.

Pertinent allegations of the amended bill are viz: Prior to September 18, 1940, "The Casements," the former home

of the late John D. Rockefeller, Sr., located at Daytona Beach, Florida, now owned by the latter's estate and controlled by John D. Rockefeller, Jr., the executor. The plaintiff, Maud van Woy, was interested in the property as a school for girls. She was not familiar with real estate values; that she was desirous of an interview with John D. Rockefeller, Jr., for a discussion with him looking toward the possible purchase of the property; that plaintiff was a resident of Washington, D. C., and engaged in the operation of a girls' school in said City.

Pierre La Jard Willis was a real estate broker of West Palm Beach and contacted the plaintiff during the months of August, September and October, 1940, with the view of selling her "The Casements" as a school for girls for the sum of $75,000.00. Willis at the time was not the agent of Rockefeller, nor was he the owner of "The Casements." He falsely represented to the plaintiff that he was the agent of the owner of the property and stated that it could not be purchased for less than $75,000.00; that he had been designated by the owner as the exclusive agent to sell the property and was only interested to the extent of the usual and proper real estate commission.

The plaintiff requested Willis, it is alleged, to arrange an interview for her with the owners so that she might personally determine if they would be willing to sell "The Casements" for a sum of money less than $75,000.00, and he (Willis) agreed so to contact the owners and arrange for the interview; that Willis did not contact the owners, as promised, but thereafter returned to the plaintiff and falsely announced that he had contacted the owners but they did not care to bother with details and would not consent to an interview, and falsely stated that he had been given authority to act for the owners and that they would deal with plaintiff only through him, and the purchase price was definitely fixed at $75,000.00; that the statements so made by Willis to the plaintiff were false and plaintiff believed they were true and acted upon these false representations and signed a written agreement on September 18, 1940, agreeing to pay $75,000.00 for "The Casements," and paid Willis $5,000.00 as a down

payment on the purchase price; that the written agreement so signed contained false recitals, falsely represented by Willis to the plaintiff as being placed therein pursuant to the direction of the owners.

The $5,000.00 check, down payment, was payable to John D. Rockefeller, Jr., and delivered by plaintiff to Willis. It is further alleged that Willis never tendered the check to the owners but as a step in the schemes and plans of defendant to deceive the plaintiff, returned it to her and stated that John D. Rockefeller, Jr., requested that in lieu of the $5,000.00 check payable to John D. Rockefeller, Jr., that two checks be issued by plaintiff payable to Willis—one for $1,000.00 and the other for $4,000.00; that the requested change was falsely represented by Willis to be the request of the owners.

Another step in Willis' scheme and plan to defraud plaintiff occurred on or about October 16, 1940, when he advised plaintiff that the owners requested the execution of a second purchase contract for the property whereby Willis was placed in control of the sale and falsely represented that it was the owners' request so as to relieve them of the incidental details of negotiations. That the statements were false and made by Willis for the purpose of obtaining her money and signature to the contract of purchase, and plaintiff acted on the false representations and the owners of the property were without knowledge of the false representations made to plaintiff by Willis.

Plaintiff prior to signing the second purchase price contract again requested Willis to secure an interview for her with the owners for the purpose of obtaining a price on the property less than $75,000.00; that Willis agreed so to do and after a short time returned to the plaintiff and falsely represented that he had contacted the owners and presented the request for the interview, but that the owners declined the requested interview, which representations were false and untrue. That he stated if the property was to be purchased by the plaintiff, negotiations would have to be made with him (Willis) as the sole representative of the owners and that the owners were unwilling to accept less than $75,000.00, which

statements were false, but plaintiff, believing them to be true, acted to her loss and detriment.

Plaintiff requested Willis to contact the owners and ascertain from them if more favorable terms of payment could be obtained than enumerated in the second contract of purchase, which he agreed to do, but shortly thereafter returned to plaintiff and falsely represented that the owners were unwilling to grant better terms. It is alleged that the statements were false because Willis did not contact the owners; was not their exclusive agent in the sale of the property, and the owners had never been requested to grant plaintiff better terms. That the plaintiff believed the false representations made to her by Willis as true and acted thereon to her injury.

Plaintiff requested an adjustment of a clause in the second mortgage and requested Willis to contact the owners with a view of eliminating the same. The objectionable clause required the plaintiff's school located in Washington, D. C., to endorse the notes. Willis agreed to contact the owners and present plaintiff's request. Some few days intervened, when he returned and falsely represented to the plaintiff that the owners would not sell the property on terms *without* the objectionable clause. That Willis had never contacted the owners or requested of them an adjustment and plaintiff, believing the false statements to be true, acted upon same to her injury. The second agreement was obtained from plaintiff by Willis on the false representation that he was the exclusive agent for the owner; that he had presented plaintiff's request for an interview, the request for more favorable terms, and the request for an adjustment of a clause in the mortgage, and falsely represented that the owners had declined each request, and that the statements were false and known to be false on the part of Willis.

The amended bill further alleged that Willis knew the property could be bought for less than $75,000.00; that Willis falsely and fraudulently represented to the plaintiff that he was agent for the owners and was handling the property in their behalf; that he falsely represented that the owners were unwilling to sell the same for less than $75,000.00, when as a

matter of truth and fact the owners were willing to sell it for $37,500.00, and did sell it to Willis for said sum. Willis represented to the plaintiff that he was interested in the sale of the property to the limited extent of a proper and usual real estate commission. The truth was that Willis was not the agent of the owners; he had never contacted them or presented plaintiff's request to the owners; that he was interested to a greater extent than the usual and just real estate commission as a broker; that he was interested in a large profit from the sale of the property, to-wit, $37,500.00, because the owners of the property were willing to sell the same for $37,500.00.

Paragraph 5 of the amended bill is viz:

"This plaintiff further alleges that as a part and parcel of the defendant's scheme to defraud this plaintiff into paying more than she should have for the property, the defendant upon and after the execution of the contract last mentioned, contacted the owners of the property with the view of purchasing for himself, the defendant, these premises at and for the sum of Thirty-seven Thousand Five Hundred ($37,500.00) Dollars, and that the owners of the property did enter into such contract with the defendant, the same being entered into on October 21, 1940, and the plaintiff alleges that the consideration paid to the owners of the said property at the time of the execution of said contract was the same Five Thousand ($5,000.00) Dollars or a part thereof, which the defendant had fraudulently obtained from this plaintiff as hereinabove alleged and that the plaintiff did not know of this transaction at the time of completing the purchase of said property nor was known by the plaintiff until a much later time as is herein alleged."

Plaintiff alleged further that the $5,000.00 paid by her to Willis was by Willis paid to the owners and a purchase price contract signed whereby Willis was to acquire title to "The Casements" for $37,500.00. Willis assisted plaintiff in raising the $37,500.00 which was obtained from a bank at Daytona Beach. That this was necessary in order to close the sale agreement between the owners and Willis so that the title could be transferred to the plaintiff. Plaintiff then exe-

cuted a second mortgage for $37,500.00 to Willis on "The Casements" and other collateral of plaintiff. The notes and second mortgage payable to Willis were prepared by him and presented to plaintiff to sign.

The amended bill alleges:

"This plaintiff further says that the defendant at the same time of presenting the above instrument for execution represented to her that the notes and mortgages were pursuant to the contract of purchase, and said defendant further stated to this plaintiff that the owners had requested said notes and mortgages to be executed in his favor and that he, the defendant, was to hold said notes and mortgages for the said owners pursuant to instructions; that this plaintiff further says that such representations on the part of the defendant were untrue and were known to be untrue by this defendant when made, and said representations were made by said defendant as a part of his scheme and plan to defraud this plaintiff out of large sums of money; that this plaintiff however believing that said representations were true and relying on same and believing same to be true, did on November 15, 1940, execute said five (5) notes, aggregating Thirty-seven Thousand Five Hundred ($37,500.00) Dollars payable to this defendant and had the same then endorsed, each of said notes, Fairmont School Inc., by Maud van Woy, President, and to secure the payment of said notes executed and delivered on said date to the defendant the mortgages . . ."

That after the execution of the $30,000.00 mortgage to the bank at Daytona Beach on "The Casements," Willis retained the physical possession of the same and represented the plaintiff on November 19, 1940, at a meeting called for the purpose of closing the trade attended by the attorneys of the owners, the defendant, and the attorneys for the Daytona Beach bank and held without notice to the plaintiff. The attorneys for the owners insisted that the contract of purchase signed by them should be assigned to the defendant, which was done, and secretly retained by defendant from plaintiff; plaintiff was without knowledge of the assignment until sometime prior to the institution of the suit at bar. The contract set forth the details of purchase and disclosed that Willis paid

the owners $37,500.00 for the property and sold it to the plaintiff for $75,000.00, and it appears that his statement of extent of his interest being limited to a broker's commission was false. Plaintiff's down payment to Willis was delivered to the owners and Willis never invested a single dollar of his own in the property.

Plaintiff, assisted by Willis, refinanced the $30,000.00 mortgage held by the Daytona Beach bank with a bank at Palm Beach for the sum of $40,000.000. The second mortgage given by plaintiff to Willis was subordinated thereto. Willis at the tme represented that he was the sole agent of the owners and entitled to a 5% commission payable out of the last notes paid; that the owners had received and retained all previous amounts paid and demanded of plaintiff $5,000.00 of the additional sum obtained by the refinancing program and plaintiff, believing the false statement, paid to Willis the $5,000.00, to her injury.

Additional allegations of fraud, deceit and misrepresentation appear in the amended bill of complaint, coupled with pertinent allegations showing a full and complete picture of the transaction between the parties, which are unnecessary to recite for a disposition of the point in controversy. The plaintiff offers to do equity. Exhibits are attached to and by appropriate language made a part of the amended bill of complaint. The prayer is for an accounting between plaintiff and a decree of cancellation of the notes and mortgage by plaintiff to Willis and by him assigned to the bank at Palm Beach.

Pertinent grounds of the motion to dismiss the amended bill of complaint are viz: (1) the parties by the allegations of the bill are shown to have dealt at arms length so that a trust and fiduciary relationship has not been made to appear; (2) the allegations of fraud and deceit are legally insufficient; (3) the purchase of the property by Willis for $37,500.00 and the sale to the plaintiff for $75,000.00, *ipso facto*, does not constitute actionable fraud; (4) the allegations of fraud and deceit attempt to vary, alter, and contradict the terms of written instruments by appropriate allegations made a part of the amended bill; (5) the allegations of injury are but con-

clusions of the pleader; (6) plaintiff by the allegations of the amended bill fails to do equity by restoring the status quo to the defendant as a condition of cancellation and recission.

The case of Boswell & Rose v. Cunningham, 32 Fla. 277, 13 So. 354, involved a real estate transaction. Mrs. Cunningham employed Boswell & Rose, real estate agents, to purchase for her a designated piece of real property. The agents negotiated the purchase at a stated price and was approved by Mrs. Cunningham, who paid $100.00 on the purchase price and went North to raise the remainder due for the property. She raised the amount necessary to close the deal and advised her agents. One of the agents, in the interim, accepted title to the designated property and paid therefor a considerable sum less than that which he bought it for his principal, but did not notify her. She advised the agent of her willingness to pay the remainder of the purchase price. The Court held that the agent had placed himself in *adverse* position to his principal during the existence of the agency; that the agent failed to give the principal the skill, ability and industry to which she was entitled and that the agent could not lawfully betray his principal, thereby advancing the interest of the agent. The Court, in part, said (text 32 Fla. 285-6):

". . . Where the relation of principal and agent exists, the utmost good faith is exacted in all of the transactions of the agent towards his principal in all matters connected with the subject of the employment. And where an agent is employed to make a purchase of land, the principal is entitled to all the skill, ability and industry of such agent to make the purchase on the best terms that can be had, and is entitled to the property at the price which the agent pays. And the agent is not permitted, without the assent of the principal, to acquire an interest in the subject-matter of the agency, adverse to that of his principal. The agent, during the continuation of the agency, can not put himself in a position adverse to that of his principal; and where the agent, employed to purchase for his principal, purchases for himself, all the profits and advantages gained in the transaction belong to the principal, and the agent will be held to have taken the property as trustee for his principal. Such a trust

comes within the exception provided for in our statute of frauds . . ."

Some of the duties and obligations due by a real estate broker to his client are stated by this Court in Skinner Mfg. Co. v. Douville, 57 Fla. 180, 49 So. 125, thusly:

" 'One of the first duties that a broker owes to his client is to remain loyal to the latter's interests. By reason of the fact that the client has employed him in preference to others great confidence and trust has been reposed in him. Consequently it is his duty to do nothing that will abuse or destroy that confidence or trust, but to always remain faithful and loyal to his principal's interests. Thus it is his duty not to undertake incompatible duties, nor to assume incongruous characters, nor to act in a transaction where he has or represents interests adverse to those of his principal. So it is his duty at all times to disclose to his principal any facts or circumstances that may make his interests or those of another whom he represents, adverse to his principal's interests, or that may affect the latter in any way. If he does not undertake to present adverse interests or acts adversely to his principal in any part of the transaction or does not disclose any interest that would naturally tend to influence his conduct of the transactions it would be such a fraud upon the principal as would render the broker liable to the principal for any loss sustained thereby, or as would preclude the broker from recovering any compensation for his services.' "

See Burnham City Lbr. Co. v. Rannie, 59 Fla. 179, 52 So. 617; Thomas v. Goodbread, 78 Fla. 278, 82 So. 835.

The truthfulness of well pleaded allegations appearing in a bill of complaint when presented to a chancellor for a ruling on motion to dismiss is, as a matter of fact, for the purpose of disposition thereof admitted to be true. It is not contended that the defendant in the case at bar was ever the agent of the owners of the property. Language in Exhibit "A" is viz: "Agreement made the 18th day of September, 1940, between John D. Rockefeller, Jr., and/or Pierre L. Willis and/or the estate of John D. Rockefeller of New York of the first part and Maud van Woy of Washington, D. C., of the second part." The contract of purchase was signed by

Pierre L. Willis and Maud van Woy. The latter, on the day of the signing of the contract (September 18, 1940) gave Willis check for $5,000.00 payable to the owners, although later made payable to Willis and by him delivered to the owners and a contract of purchase accepted in the name of Willis.

We concede, *arguendo,* that the pertinent allegations of the amended bill fail to establish the relationship of principal and agent between Willis and Maud van Woy. The delivery of a $5,000.00 check by Maud van Woy to Willis under the terms of the purchase price contract dated September 18, 1940, as a down payment on "The Casements" has, to say the least, legal significance. The acceptance of this check by Willis created obligations on his part.

The case of Quinn v. Phipps, 93 Fla. 805, 113 So. 419, 54 A.L.R. 1173, involved a real estate deal. Quinn was a real estate broker at West Palm Beach, Florida, and Jennie E. Watson resided in Boston, Massachusetts, but owned designated real estate in Palm Beach County, Florida. Phipps, through his agent McDonald, offered Quinn (reputed agent for Mrs. Watson) $50,000.00 for the Palm Beach County property. Phipps' agent, McDonald, requested Quinn to submit to Mrs. Watson over long distance telephone the $50,000.00 offer of Phipps, which Quinn declined to do, but went to Boston, contacted Mrs. Watson and acquired an option to purchase the property for the sum of $45,000.00, but at no time did he ever communicate to Mrs. Watson the Phipps' offer of $50,000.00. Phipps brought suit against Quinn and Mrs. Watson and prayed that the option from Mrs. Watson to Quinn be decreed and held in trust by them for the sole use and benefit of Phipps; that Phipps be decreed to stand in the shoes of Quinn with reference to the purchase under the terms and conditions of the option, and that Mrs. Watson be required to convey the land to Phipps rather than to Quinn. The chancellor on final hearing granted the Phipps' prayer and the same was on appeal affirmed by this Court.

In Quinn v. Phipps, *supra* (text 93 Fla. 809-11), this Court speaking through Mr. Justice TERRELL, in part, said:

"The term 'fiduciary or confidential relation' is a very

broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confidence has been reposed and betrayed. The origin of the confidence is immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies upon another. Words and Phrases (2nd series) 529; Irwin v. Sample, 213 Ill. 160, 72 N.E. Rep. 687 (quoting and adopting definition in 2 Pomeroy's Eq. Jur., par. 947, page 956).

"In Beach v. Wilton, 244 Ill. 413, 91 N.E. Rep. 492, the Court, adopting the language of Pomeroy in his Equity Jurisprudence (3rd ed.), Vol. 2 Par. 956, defines the term fiduciary relations and outlines the conditions under which relief will be granted from its abuse, in the follownig words:

" 'Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which the fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic, or merely personal. The rule as thus stated has been repeatedly quoted with approval by this Court. Roby v. Colehour, 135 Ill. 300, 25 N.E. 777; Thomas v. Whitney, 186 Ill. 225, 57 N.E. 808; Walker v. Shepard 210 Ill. 100, 71 N.E. 422; Irwin v. Sample, 213 Ill. 160, 72 N.E. 687. The fiduciary relation exists between parties where there is a relation of trust and confidence between them, that is where confidence is reposed by one party and a trust accepted by the other. In Mayrand v. Mayrand, 194 Ill. 45, page 48, 61 N.E. 1040, page 1041, this Court said: 'The term 'fiduciary' or 'confidential' relation, as used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial.

The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?' "

An employee is bound to the exercise of the utmost good faith toward his employer, and cannot without the latter's consent retain profits or earnings received in the course of the performance of the employer's business or in an undertaking which may constitute a breach of duty to the employer. See Connelly v. Special Road and Bridge Dist. No. 5, 99 Fla. 456, 126 So. 794, 71 A.L.R. 923; The rule enunciated in Quinn v. Phipps, *supra,* has been reaffirmed by this Court in several cases. See Grantham v. Brightwell, 96 Fla. 366, 117 So. 885; Fulton v. Clewiston, Limited, 100 Fla. 257, 129 So. 773; Willis v. Fowler, 102 Fla. 35, 136 So. 358; McCarthy v. Palmer, 110 Fla. 443, 148 So. 867; Walker v. Landress, 111 Fla. 356, 149 So. 545; Fisher v. Grady, 131 Fla. 1, 178 So. 852.

The trend of modern authorities sustain the rule enunciated in Quinn v. Phipps, *supra.* Pomeroy's Equity Jurisprudence, Vol. 4 (5th ed.), pages 140-41, par. 1056b, says:

"There is a conflict of opinion as to whether an agent verbally employed to buy land for another, but who purchases it for himself with his own funds, may be compelled to convey it to his principal. Some courts seem to feel that to let in oral proof that the purchase was to have been made for another is virtually to abrogate the statute of frauds; while others regard the agreement as creating a relationship of trust and confidence, a violation of which will give rise to a constructive trust to which the statute of frauds does not apply. The modern current of authority appears to be to the effect that if an agent be employed to negotiate the purchase of land for his principal, and violates the principal's confidence by purchasing the land with his own money and taking a deed therefor to himself, he becomes a constructive trustee for the principal's benefit, upon payment of the purchase price. This is the rule adopted by the American Law Institute. 'The agency may be established by a written contract or a verbal contract, or no contract whatever, the

assumption of confidence involving a purely gratituous service, for which the agent is to receive no compensation in any form.' . . ."

Likewise Pomeroy's Equity Jurisprudence, Vol. 3 (5th ed) pages 825-26, par. 959c, states the rule viz:

"Illustrations.—These general doctrines are applied under every variety of circumstances and to every kind of transaction. As illustrations, when an agent has, during his employment, discovered a defect in his principal's title, he cannot, after the agency is ended, use such knowledge for his own benefit; much less can he do so while the agency exists. Nor is an agent employed to purchase or to sell, or in any other business, permitted to make profits for himself in the transaction, unless by the plain consent of his employer; for all such profits wrongfully made he must account to his principal; and if he has taken the legal title to property in violation of his fiduciary duty, equity will treat him as a trustee thereof for his principal."

See 3 C.J.S. pp. 6-14, pars. 138-9; 2 Am. Jur. pp. 202-06, pars. 251-54, Harrop v. Cole, 85 N.J. Eq. 32, 95 Atl. 378.

Counsel for appellee point out that the rule enunciated in Quinn v. Phipps, *supra,* does not apply to the allegations of the amended bill because (a) a strong inference or a reasonable deduction gathered from the amended bill, when considered in its entirety, is that Willis was the exclusive agent of the owners in the sale of the particular property; (b) that $75,000.00 was a fair price for the property; that the plaintiff had an opportunity to inspect the same prior to purchase, and that the parties dealt at arms length; (c) that no legal rights of the plaintiff were involved by the transaction because it does not affirmatively appear that the relation of principal and agent existed between the parties; (d) that plaintiff was not in a position to contend that the profit of Willis was inequitable; (e) that a trust relation does not exist between the parties and the rule enunciated in Huttig v. Nessy, 100 Fla. 1097, 130 So. 605; Pryor v. Oak Ridge Development Corp., 97 Fla. 1085, 119 So. 326; Peacock Hotel, Inc. v. Shipman, 103 Fla. 633, 138 So. 44, and Duvall v. Walton, 107 Fla. 60, 144 So. 318, is here controlling.

Our study and analysis of these cases fail to disclose the fiduciary relationship between the parties involved. The $5,000.00 check given to the defendant was paid to the owner and a contract of purchase accepted in his name. The defendant assisted plaintiff in obtaining a loan at the bank of Daytona Beach; the title to "The Casements" was placed in the plaintiff's name when she was not present but the defendant represented her; the contract of purchase at the time and place of closing was assigned to plaintiff; this instrument disclosed the exact amount Willis was paying for the property; if she had been given an opportunity to attend the meeting when the trade was closed, the details of the contract of purchase would have been ascertained then; this debt was later refinanced at a Palm Beach bank through the efforts of Willis—it was to his financial interest that the debt be refinanced and if he was not the agent of the plaintiff in these several transactions, certainly he was due her certain duties and obligations, arising out of the relationship then existing between them.

It is our conclusion that the amended bill of complaint is sufficient to withstand the attack made by the motion to dismiss. It is possible that the defendant's answer to the amended bill of complaint and the testimony in support thereof by the defendant will place the equities of the controversy with the defendant on final hearing, but on this phase of the case we express no opinion.

The order of dismissal appealed from is hereby reversed with directions for further proceedings in the lower court not inconsistent with this opinion.

It is so ordered.

BUFORD, C. J., TERRELL, BROWN and SEBRING, JJ., concur.

THOMAS and ADAMS, JJ., dissent.