123 So.2d 721 (1960)
Barnard PRESCOTT, Oliver W. Kuhn, Warren M. Dilsaver, and Joseph M. Mandese, Appellants,
v.
Karl KREHER and Marine Bank & Trust Company, a Florida corporation, Appellees.
Nos. 1779-1782.
District Court of Appeal of Florida. Second District.
September 30, 1960.
Rehearing Denied November 10, 1960.
*722 James B. McDonough, Jr., Tampa; David C.G. Kerr and William Terrill Hodges, Tampa, of counsel; Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellants.
Corcoran & Henson, Tampa, for appellee, Karl Kreher.
KANNER, Judge.
A suit in equity seeking an accounting has resulted in five separate appeals involving two orders of the lower court. These appeals, which have been consolidated for consideration here, include the court's initial order, interlocutory in nature, wherein the chancellor found that the plaintiffs, Prescott, Kuhn, Dilsaver, and Mandese, were not entitled to an accounting, and a subsequent order denying petition for rehearing and dismissing the cause as to those plaintiffs. Through caution, interlocutory and final appeals from both orders were taken. However, in view of the court's dismissal of the cause as to the four named plaintiffs, the matters presented with reference to them are here reviewed as a final appeal. By the first order above referred to, the chancellor also found that the plaintiff, Beynon, as administratrix of the Estate of Schuyler B. Burdett, was entitled to an accounting; and the defendant, Kreher, has entered an interlocutory appeal as to this, making the fifth appeal, which will be disposed of in a separate decision. Kreher v. Beynon, Fla.App., 123 So.2d 731.
The accounting requested is the result of transactions flowing from the corporate organization and financing of the Jim Walter Corporation, a firm engaged in the construction of homes. The plaintiffs have offered to do equity. The relief sought is not limited to an accounting by the defendant, Kreher, but applies also to the plaintiffs so that there will be a determination of what is necessary to be paid, received, or distributed by the plaintiffs and the defendant in order to correspond with their several interests.
*723 Circumstances leading up to and surrounding the requested accounting constitute a highly involved narrative which had its beginning early in 1955. At that time, six men employed by the securities and brokerage firm of A.M. Kidder & Company in Tampa joined together in an agreement to pool and distribute their earnings through what they termed an "earnings pool." These men, Prescott, Kuhn, Dilsaver, Mandese, Kreher, and Burdett, the last named being now deceased, were engaged in selling securities and were paid by the Kidder company on a commission basis. Their purpose in entering into the earnings pool agreement was to stabilize their earnings, to effect a more smoothly running office, and to forestall harmful competition and disputes as to commissions earned. Each man agreed to pay into the pool all commissions which he earned, and the proceeds were to be distributed to the individual members. Prescott, Kuhn, and Kreher, as senior members, would each receive two-ninths; while the other three, as junior members, each would receive one-ninth of the proceeds. The agreement covered a period from February, 1955, to December 31, 1955. Managing the pool was Prescott, the office manager, or Prescott and Kuhn, who kept the fund in a joint bank account.
The plan went into operation; and in May or June of that year Kreher made an agreement with J.W. Walter of Walter Construction Company, then a partnership, to handle the corporate organization and financing of the construction company and its subsidiaries. He procured a leave of absence from the Kidder company so as not to involve that organization in handling the corporate financing of the Walter company and left to devote his full time to this endeavor. It was understood and agreed that Kreher would continue drawing from the earnings pool and would, in turn, pay into the earnings pool any compensation which he might earn for services in connection with the financing of the Jim Walter Corporation and the sale of its securities. Members of the earnings pool also agreed to help to whatever extent they could without involving A.M. Kidder & Company. Pursuant to the agreement, Kreher, although on official leave of absence from the Kidder company, did continue to draw from the earnings pool until sometime in December of 1955. Kreher served as the representative of the earnings pool members with reference to the corporate organization, financing, and sale of securities of the Jim Walter Corporation.
With these basic facts in mind, we now observe that Kreher's financing of the Walter corporation, as it eventuated, developed into a successful and most lucrative enterprise. Some members of the earnings pool prospered through these financing operations more than did the others, particularly Kreher and, to a lesser degree, Prescott and Kuhn, as will be pointed out later.
We proceed now to the developments which transpired after Kreher took over the corporate organization and financing of the Walter enterprise. In June of 1955, Kreher submitted to the Walter group two plans of financing, one designated as an orthodox plan and the other as his unorthodox plan. The latter was accepted. That plan specified issuance of certain securities to the Walter group in return for the assets of the partnership and also issuance of certain other securities for sale to new incorporators. Securities to be thus issued consisted of bonds, convertible bonds, participating bonds, common stock, bond or "A" warrants, bond or "A" warrant options, and common stock or "B" warrants. Those securities were to be divided into 408 portfolios, 108 of which were to be issued to the Walter group and 300 to be sold to the new incorporators. Specified in the plan of financing was the provision that 120,000 bond warrant options and 120,000 common warrants to be issued to the Walter group would be sold by them to Kreher at the issue price of one cent each, or a total of $2,400. That feature of the *724 plan under which Kreher would purchase the 240,000 warrants was not disclosed to members of the earnings pool, and it was nearly two years later that Prescott and Kuhn learned of it.
Kreher guaranteed the subscription of the entire plan for financing and guaranteed to raise an initial deposit of $105,450. He made good those guarantees. Members of the earnings pool did not contribute to the guarantee deposit, but included in that deposit was the sum of $2,400 for the 240,000 warrants Kreher was to buy from the Walter group.
Compensation to Kreher for his handling of the financing was through the sale of "founders warrants" and "founders portfolio warrants." These warrants were options giving the purchasers the right to buy portfolios of securities in the new corporation, to all of which Kreher had subscribed. The founders warrants applied to the Walter group, the price being $250 each; while the founders portfolio warrants applicable to the 300 portfolios to be sold to new incorporators were priced at $253.50 each, on the average, depending upon the date of option. Kreher was entitled, under his agreement with the Walter group, to the proceeds of the sale of founders warrants and founders portfolio warrants. These proceeds he claimed on behalf of the earnings pool. It was contemplated that the earnings pool would claim 26 portfolios of securities from the proceeds of the sale of founders warrants and founders portfolio warrants.
There was a meeting of those selected as prospective investors, and Kreher presented the plan. It was shown that 108 portfolios were designated for the Walter group, and 300 portfolios to which Kreher had subscribed were being offered. Of these, 26 portfolios were shown as having been subscribed to in two groups of 13 each, and these 26 portfolios were the ones set aside for the earnings pool. Kreher, with the knowledge of the earnings pool members, purchased 55 of the portfolios, and the other portfolios offered were expeditiously sold. This took care of the fund guaranteed by Kreher.
Prescott, through his brother who was head of a brokerage firm in Ohio, succeeded in obtaining additional profitable credit for the Walter group. In this connection, Prescott himself received a finder's fee totaling $10,911.34 from his brother and arranged to purchase "A" warrant options, particularly 1,000 on December 15, 1957, from the Walter group at one cent each. Upon these he reaped great personal profit.
Having launched successfully the corporate organization and financing of the Walter group, Kreher, together with Prescott and Kuhn, met with Walter for the purpose of settling claims of the earnings pool members. The 26 portfolios of securities which we have stated were allocated for purchase by members of the pool were then claimed; but the Walter group had sold these, and other securities were to be substituted. The men reached a tentative agreement, and Walter's attorney drew up and presented to Prescott, Kuhn, and Kreher a release. Kreher refused to sign the release, the reason being that it would have relinquished his claim to the 240,000 warrants, although he did not then make known his reason. Later, in April, 1957, Kreher by letter to Walter asserted his claim to the 240,000 warrants. Walter subsequently showed Kreher's letter to Prescott and Kuhn, and this was the first they knew of Kreher's claim solely on his own behalf.
Following the development which revealed Kreher's independent claim of the 240,000 warrants, Prescott and Kuhn proceeded to settle separately the claims on behalf of the earnings pool members, except the individual claims of Kreher. The instrument purported to release any claims which Prescott and Kuhn, along with their principals and associates, had against the Walter group for fees or commissions as to services rendered in connection with raising capital and otherwise procuring finances *725 for the Jim Walter Corporation. The release[1] specifically did not apply to rights held by Kreher individually, nor was there anything in it directed to rights of earnings pool members against Kreher. At the time the release was executed, Prescott and Kuhn stated to the Walter attorney, Norman Stallings, Esquire, who drew it that they did not wish to release any claims they might have had against Kreher and inquired what effect the release would have on the rights of the earnings pool members against him. The attorney replied that he did not know but that in his opinion the release would not affect their rights against Kreher.
As consideration for the release, Prescott and Kuhn received 2,000 "B" warrants from the Jim Walter Corporation and were given the opportunity to purchase 5,000 "A" warrant options at one cent each, or $50. These 5,000 "A" warrant options were distributed between Kuhn and his wife, Prescott and his wife, and Mandese: The $50 used for the purchase of the 5,000 "A" warrant options was paid from the earnings pool account; but as between the members, no settlement was ever made with either Dilsaver or Burdett.
Litigation was subsequently instituted by Kreher against the Walter group as to his claim for 26 portfolios of securities and also as to his claim for the 240,000 warrants. As a result, he settled his claim to the 26 portfolios for $15,000 cash paid by the Walter group. He settled his claim *726 against the Walter group for the "A" warrant options and "B" warrants for 20,750 "A" warrant options and 20,000 FRB warrants, since the Walter group by corporate action had modified the "B" warrants into FRB warrants. Kreher also, for 5,000 "A" warrant options, settled a suit against a third party who he claimed had bought them with knowledge of his claim. Thus, from his claim for 240,000 warrants which had originally been kept secret from his earnings pool associates, Kreher obtained 25,750 "A" warrant options and 20,000 FRB warrants in addition to the $15,000 received from his claim for 26 portfolios of securities. A portion of the warrants received by Kreher as a result of his claim for the 240,000 warrants went to pay his attorneys' fees and a portion is held in escrow by the Marine Bank and Trust Company, as required by the settlement agreement. Apart from the escrowed warrants, certain of the warrants are held by the Marine Bank and Trust Company in a custodian account.
We here observe that although the original issue price of the "A" warrant options and the "B" warrants was one cent each, these warrants were favored with outstanding prosperity on the market and the price for them has increased tremendously. The same applies to those warrants received in the settlement Prescott and Kuhn effectuated with the Walter group. However, fortune particularly favored Kreher, who, through his claim for 240,000 warrants, reaped the major profit. It may be stated, however, that the warrants which Prescott, Kuhn, and Mandese received in the settlement were of considerably more value than is represented by the $15,000. in cash received by Kreher under his claim for the 26 portfolios of securities. As indicated, Dilsaver and Burdett have never received anything from the settlements.
By his own testimony, Kreher evinced the intent to credit the earnings pool with the profits from the sale of founders warrants and founders portfolio warrants which, under his agreement with the Walter group, would have gone to him individually. Kreher's individual purchase of 55 portfolios of securities was made with knowledge of the earnings pool members, who make no claim as to that. There should be no confusion with reference to that particular purchase by Kreher as against the secret profits which he made additionally.
It was the opinion of the lower court, among other things, that "* * * the facts involved show without question that irrespective of whether the relationship between Kreher and the other members of the `Earnings Pool' is one of partnership, joint venture or trustee and beneficiaries, nevertheless, they were associates in a common enterprise and had a duty to each other to make a full disclosure of their deals or any preference or profit in common to all of the associates." This the court held to be particularly true of Kreher, Prescott, and Kuhn, senior members of the group. As to Kreher and his representation of the earnings pool with respect to the Walter financing the court held that Kreher had a particular fiduciary or confidential relationship since there was vested in him the sole and exclusive authority to represent the earnings pool. Kreher's agreement with members of the earnings pool the chancellor held as a binding one based upon a valuable consideration, although recognizing that the agreement covered a transaction outside the basic purpose of the earnings pool. The court identified that transaction as being one by which Kreher was to contribute his labor, experience, and skill in the handling of the Walter endeavor and by which the other members, in return, were to and did continue him in the earnings pool. Thus Kreher, continued the court, was to turn over anything and everything he received from the Walter transaction to be divided among the members of the earnings pool in the same proportion as before.
We shall now analyze this holding of the court below with reference to confidential or fiduciary relations. In the case of Quinn v. Phipps, 1927, 93 Fla. 805, 113 *727 So. 419, 54 A.L.R. 1173, the Supreme Court dealt with the term "fiduciary relations," with its characteristic conditions under which relief may be granted from its abuse, by quoting from Pomeroy's Equity Jurisprudence, 3rd Ed., Vol. 2, paragraph 956, which doctrine the Supreme Court has followed. The definition given is prefaced with the statement that courts of equity have refrained from defining particular instances of fiduciary relations in such a manner that other instances might be excluded. Instead, the principle applies under the definition to every possible case wherein there exists as a fact a fiduciary relation through which, on one side, a confidence is reposed and, on the other side, there is the resultant superiority and influence. There is a fiduciary relation between parties where confidence is reposed by one and a trust accepted by the other. The relation need not be legal but may be moral, social, domestic, or purely personal. Thus, the term, "fiduciary" or "confidential" relation as defined is a very broad one. Such a relation has been said to exist and to suffice as a predicate for relief in all cases wherein influence has been acquired and abused, or wherein confidence has been reposed and betrayed. The origin of the confidence is immaterial. The principle applies both to technical fiduciary relations and to informal relations wherein one man trusts in and relies upon another. See also the case of Van Woy v. Willis, 1943, 153 Fla. 189, 14 So.2d 185.
From the narrative of the facts of this case, as analyzed in the light of the above definition, Kreher indisputably occupied a confidential and fiduciary relationship with reference to the other members of the earnings pool. With the same force and effect as the principles of fiduciary relationship apply to Kreher, these principles apply also to other members of the earnings pool. Although Prescott, Kuhn, and Mandese did receive a settlement while Dilsaver and Burdett received nothing, the settlement grew from the success of the general financing plan which was made possible primarily through Kreher's efforts. It may be recalled that Prescott was manager of the earnings pool and that he, along with Kuhn, kept the pool fund in a joint account. These two stood in a definite fiduciary relationship toward the other members. We have pointed out that Prescott, like Kreher, received profits through his finder's fee and through his preferential and advantageous purchase of "A" warrant options arranged with the Walter group. Additionally, Prescott and Kuhn, in the purchase of warrant options when they settled with the Walter group, used earnings pool money.
Holding that the members of the earnings pool were associates in a common enterprise and had a duty to each other to make a full disclosure, the lower court found that, although Kreher put up his own money for the purhcase of the 240,000 warrants from the Walter group, his opportunity to purchase those warrants was the result of his fiduciary position in handling the Walter transaction as a representative of the earnings pool and that this purchase constituted a secret profit which in equity should inure to the benefit of the earnings pool. As to this, we agree.
Our view, however, is at variance with that phase of the lower court's opinion concerning the effect of the release executed by Prescott and Kuhn in their settlement with the Walter group. The chancellor's holding was that the settlement thus effected is binding upon Prescott and Kuhn and any other members of the earnings pool. He further held that the release is effective even though Prescott and Kuhn might not have intended to release any claim they might have had against Kreher, that this was obviously an attempt by Prescott and Kuhn to release their part of a joint claim against a third party and is binding on them as against Kreher. This would mean that Kreher would be able to retain for himself the profits which the court had held otherwise should have accrued to the earnings pool. The authority relied upon by *728 the chancellor as to this was Collins v. Dawson, Tex.Civ.App. 1932, 54 S.W.2d 256.
A rudimentary principle, one not requiring citation of cases but calling only for general authorities, is that in construction of an instrument of release, the question as to what persons are released through such an instrument depends, generally, upon the intent of the parties to it as gathered from a proper construction of the instrument. 76 C.J.S. Release § 48, p. 677; and 28 Fla.Jur., Release, section 13, p. 130.
We have carefully examined the Collins v. Dawson case and find that it does not support the chancellor's particular holding. In that case, Collins and Dawson, engaged in a joint enterprise for sale of stock owned by Vardell and Bradford, made separate settlements with the stock owners; and Dawson sued Collins for recovery of his share of the funds collected by the latter. Collins, in defending, insisted that Dawson was barred from recovery because he had proceeded against Vardell and Bradford individually, and he also sought an accounting by cross action against Dawson. The jury, in response to special issues, found that Dawson was entitled to share in the amount received by Collins from Vardell and Bradford but at the same time found that Collins was not entitled to receive any part of the money which Dawson had collected from Vardell and Bradford. The following is the portion of the court's opinion apparently followed by the chancellor in the present case [54 S.W.2d 259]:
"With reference to appellant's claim for a portion of the funds collected by appellee, the record shows that appellant informed appellee prior to the time he instituted his suit against Vardell and Bradford that he, appellant, had no claim against said parties and would not join in any litigation, and the record shows that appellant appeared as a witness testifying on behalf of and at the request of Bradford in said suit. The jury was authorized to find under the evidence that appellant claimed no interest in said litigation and had released Vardell and Bradford from any claim he had, and had relinquished and released to appellee any and all sums of money that might be recovered in said litigation."
However, it must also be recognized that the court in its opinion stated that, in the absence of waiver by the other partners, the fact that one partner collects a portion of a debt due the partnership does not preclude him from participating in the funds collected by another partner from the same debtor. The significant language on this phase is thus stated:
"Appellant and appellee, in so far as the transaction in controversy was concerned, were either partners or engaged in a joint enterprise for the purpose of selling the stock owned by Vardell and Bradford in the life insurance company. Each of them was entitled to a portion of the emoluments derived therefrom. It is a well-settled principle of law that one partner can collect all or any portion of any money payable to the partnership, and, if he collects all of the money due from any debtor, his receipt therefor binds the partnership. Whatever money he does collect, however, unless the other partners waive same, inures to the benefit of the partnership. * * * The fact that one partner collects a portion of a debt due the partnership does not, we think, bar or preclude him from participating in the funds collected by another partner from the same debtor. A partial payment to one of the partners of a part of a debt due by a person to a partnership does not thereby cancel the remaining portion of the debt or prevent the other members of the partnership from collecting same." (Emphasis supplied.)
There are characteristics of the Collins case which distinguish it from the present *729 case, the material difference being that we are here considering a written release, its effect, and the intent of the parties; while in the Collins case the court was concerned with the findings of the jury in response to an issue as to whether there had been a relinquishment of claim or release from Collins to Dawson. Telling factors in the Collins case leading to the jury's finding that Collins had relinquished and released to Dawson all possible recovery was that Collins, during prior litigation, had expressly stated to Dawson that he had no claim against Vardell and Bradford, and additionally, appeared as a witness to testify against Dawson. In the present case, on the other hand, it was never represented to Kreher by any member of the earnings pool that there had been no claim to recovery, and no member of the earnings pool took part in the action brought by Kreher against Walter. Prescott and Kuhn, in fact, were barred from doing so by the terms of the release they had given as to their claim against the Walter concern. Thus it is apparent that the facts of the Collins v. Dawson case were materially different from those presently involved.
The opinion in the Collins v. Dawson case made no statement upon which might be predicated a conclusion that there was a joint obligation by Kreher and the Walter group as to the earnings pool members.
Another case, that of Secor v. Tradesmen's National Bank, 1911, 148 App.Div. 141, 133 N.Y.S. 197, 199, concerns construction of a release. That case, briefly summarized, relates to a partnership firm, Burgess and Secor, which held a claim against the United States government for construction of a ship. This claim had been assigned to the Tradesmen's National Bank as security. Subsequently, the claim was recovered in an action by Myerle, the executor of Burgess, one of the partners, pursuant to an agreement between the parties as to prosecution of the claim. When other litigation followed and differences arose between the parties, James Secor, individually and as sole surviving partner of Burgess & Secor, brought suit against the bank, Myerle, and his attorney who had prosecuted the claim. A release to the bank was executed by Secor in his individual name, releasing the bank from all claims he might have had with reference to monies received by the bank or others from the United States government on account of the ship; and Secor consented to the discontinuance of his action. The fund remained in the hands of the attorney who prosecuted the cause against the government and no accounting was ever rendered. After Secor died, his representatives sued the bank and other parties, including the attorney mentioned, for an accounting. The appellate court held that the release given by Secor as sole surviving partner barred any claim any of the parties had against the bank but held that it could not be extended to cover other persons neither named nor referred to in it. The court ordered an accounting and said the following with respect to the release:
"But this release did not run to any one save the Tradesmen's National Bank, which alone is named therein. While it is true that he released the bank `from all claims on account of moneys received by the bank or others from the government on account of the ironclad,' thus referring specifically to the fund in question, it did not purport to discharge any one save the bank, and under no possible theory that has been suggested can a release running specifically in favor of it be extended to cover other persons, neither named nor referred to therein."
In the case of Veazie v. Williams, 1850, 8 How. 134, 49 U.S. 134, 12 L.Ed. 1018, an auctioneer joined with the owners of property in by-bidding or puffing up the price beyond what it otherwise would have been. The buyer discovered this and brought suit against the owners, after having executed *730 a release to the auctioneer. The owners contended that the release to the auctioneer operated also to release them of liability. In refuting the contention, the United States Supreme Court said as to this:
"The last exception to a recovery here by the plaintiff is, that the release to Head, the auctioneer, should be considered as discharging the respondents also. Neither the design of the parties to the release, nor the agreement or consideration to make it, extended beyond the auctioneer. It was suicidal for the plaintiff to pay for a release to get a witness in a case, which release would destroy the case itself. 2 Iredell, 219. Sitting as we do in a court of equity, we cannot, without an open and gross departure from equity, give to the release any effect beyond the design in making it, and the literal words of it, reaching only to the discharge of the release. * * *

"Again, in the present instance, there was no joint liability at law by the respondents and the auctioneer. Their accountability was separate, and resting on different grounds; his on actual falsehood  theirs on the adoption of the benefits of it, and the accountability thus arising for it. The release of one, therefore, is not like the release of a joint contractor or joint trespasser. 1 Anstruther, 38. And in equity it may well be limited to the person released and the person paying the consideration for it. Hopkins, 251, 334." (Emphasis supplied.)
The release which was executed by Prescott and Kuhn involved claims of the earnings pool members against the Walter group; thus it ran only against the Walter group and had nothing to do with claims of the earnings pool members as among themselves. It had nothing to do with secret profits made by Kreher on his purchase of the 240,000 warrants. Neither was Kreher jointly liable with the Walter group as to the earnings pool members. Kreher was not a surety, and the question of primary and secondary liability was not involved.
We find not tenable an additional argument advanced by Kreher that this suit for accounting was barred by the three year period of limitation under section 95.11(5) (e), Florida Statutes, F.S.A. Although a statute of limitation is not disregarded in equity proceedings, it is generally applicable only to actions at law. A statute of limitation deals merely with the passage of time. This suit is in equity for an accounting and was instituted June 26, 1959. Even though the parties in the present case entered into their initial agreement in the year 1955, it was not until April, 1957, that Prescott and Kuhn learned of Kreher's secret agreement for the 240,000 warrants, and it was later in that year when Prescott and Kuhn consummated their settlement with the Walter group and subsequent to that when Kreher effectuated his settlement. The action concerns a confidential and fiduciary relationship where personal gain was wrongfully acquired to the detriment of others through its breach. There is no basis for this defense, and the circumstances do not justify a charge of laches against the plaintiffs.
Of course, it might be said that the reason the plaintiffs have brought the suit is because they stand to gain substantial sums at Kreher's expense. On the other hand, viewing the situation in reverse, Kreher would have been possessed of the same right had any one of the other earnings pool members stood in his position and he in theirs.
Under the two main aspects of the chancellor's decree, that concerning Kreher's obligation to his associates in the earnings pool and that relating to the effect of the release executed by Prescott and Kuhn, Kreher's fiduciary relationship to the other members of the earnings pool emerges as the basic element upon which *731 this case rests. However, there also emerges with like effect the obligation of each of the other earnings pool members to his associates. Under the first aspect, each member of the earnings pool, because of the fiduciary obligation which existed between them, was under duty to act in good faith toward the others and to refrain from taking any personal benefit or profit out of this relationship in the absence of consent. Under the second aspect, Kreher seeks to avoid the effects of his fiduciary obligation through the escape avenue of the release executed by Prescott and Kuhn. However, that release ran only to the Walter firm and there is no basis upon which it can be said to apply to Kreher. Nothing in the release related to rights of the earnings pool members inter se. This takes us back to the fiduciary obligation of Kreher to his earnings pool associates, and this remains untouched by the release and should be honored.
As heretofore indicated, the appeal of Kreher with regard to the chancellor's decision that the estate of Burdett is entitled to an accounting will be dealt with through another decision. It may be observed that the chancellor authorized an accounting as to that estate because of Burdett's death prior to the execution of the instrument of release concerned in this controversy.
The chancellor was in error in his denial of an accounting to the plaintiffs because of the release executed by Prescott and Kuhn to the Walter group. The cause accordingly must be reversed for an accounting, with the sums, warrants, or securities received by Kreher to be consolidated with those received by Prescott, Kuhn, and Mandese, and with Prescott and Kreher alike divulging their personal preferential profits, including the finder's fee collected by Prescott. It is thus intended that there be a full accounting between the members of the earnings pool with respect to their transactions with the Walter group excepting the fifty-five portfolios of securities purchased by Kreher previously mentioned.
Reversed and remanded for further proceedings in conformity with this opinion.
ALLEN, C.J., and CARLTON, VASSAR B., Associate Judge, concur.
NOTES
[1] "Know All Men By These Presents that we, Barnard Prescott and Oliver W. Kuhn, for and in consideration of 2000 B Warrants of Jim Walter Corporation to them in hand delivered by J.W. Walter, J.O. Alston, and A.F. Saraw, the receipt whereof is hereby acknowledged, have, jointly and severally, remised, released and forever discharged and do hereby for themselves, their heirs, executors, administrators, agents, principals, associates and assigns jointly and severally, remise, release and forever discharge the said Jim Walter Corporation, its officers, agents, incorporators, stockholders, directors, successors, assigns and subsidiaries, including but not limited to Mid-State Investment Corporation, and said subsidiaries' officers, agents, incorporators, stockholders, directors, successors and assigns, the said J.W. Walter, his heirs, executors, administrators and assigns, the said J.O. Alston, his heirs, executors, administrators and assigns and the said A.F. Saraw, his heirs, executors, administrators and assigns of and from any and all debts, demands, actions, causes of action, suit or suits, claims, commissions, fees, sums of money, compensation, controversies, agreements, promises, damages and liability whatsoever, both in law and in equity, which, jointly or severally, the said Barnard Prescott and Oliver W. Kuhn, their heirs, executors, administrators, agents, principals, associates and assigns, now have or may have in the future against the said Jim Walter Corporation, its officers, agents, incorporators, stockholders, directors, successors, assigns and subsidiaries, including but not limited to Mid-State Investment Corporation, and said subsidiaries' officers, agents, incorporators, stockholders, directors, successors and assigns, the said J.W. Walter, his heirs, executors, administrators and assigns, the said J.O. Alston, his heirs, executors, administrators, and assigns and the said A.F. Saraw, his heirs, executors, administrators and assigns, for or by reason of any matter, cause, or thing from the beginning of the world to the date of these presents and more especially of and from any and all claims for or rights to compensation in the form of fees, commissions or otherwise for services or advice heretofore rendered in connection with raising capital, obtaining loans or otherwise procuring finances for Jim Walter Corporation or any of its subsidiaries, including but not limited to Mid-State Investment Corporation, regardless of whether said capital, loans or other finances have heretofore been obtained, are now being obtained or shall hereafter be obtained, liability for which said services and advice has been and is hereby denied, the payment herein being by way of compromise and without admission of any liability whatsoever provided, however, that this release does not apply to any rights now or hereafter held, jointly or severally, by Barnard Prescott and Oliver W. Kuhn as owners of stock, bond, warrants or warrant options in Jim Walter Corporation and, provided further, this release does not apply to the rights, if any, held by Karl Kreher individually."