Dr. Paul E. GARLAND and Laura
R. Garland, Plaintiffs,

v.

ADVANCED MEDICAL FUND,
L.P. II, et al., Defendants.

No. CIV.A. 1:97–CV–0010–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 18, 2000.

Frank Andrews Lightmas, Jr., Lightmas & Delk, Atlanta, GA, Maria C. Montenegro, Andrew Cotzin, Broad & Cassel, Ft. Lauderdale, FL, John W. Ringo, Marietta, GA, for Plaintiff.

Randall A. Schmidt, Savannah, GA, Robert Allen Kaiden, Kaiden & Kaiden, Smyrna, GA, Michael K. Wolensky, Angela G. Mielé, Kutak Rock, LLP, Atlanta, GA, for Defendants.

### ORDER

FORRESTER, District Judge.

This matter is before the court on various dispositive and non-dispositive motions.

## I. STATEMENT OF THE CASE

### A. *Procedural History*

Plaintiffs, Paul E. Garland, M.D. and Laura R. Garland (collectively "Plaintiffs" or "the Garlands"), filed an action relating to various investments they made against Defendants in Florida state court on February 6, 1996. On January 3, 1997, the state court dismissed the action pursuant to a stipulation on grounds of *forum non conveniens.*[1] Plaintiffs filed the instant action on January 3, 1997. The Garlands filed an amended complaint on April 16, 1997, in which they seek relief against Defendants[2] in ten counts: (1) federal securities fraud pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; (2) violations of § 12 and § 17 of the Securities Act of 1933, 15 U.S.C. §§ 77*l* and 77q; (3) violation of the Florida Securities and In-

vestor Protection Act ("FSIPA"), Fla. Stat. §§ 517.211(2) and 517.301; (4) rescission and rescissionary damages for violating §§ 517.211(2) and 517.301; (5) fraud in the inducement; (6) negligent misrepresentation; (7) breach of fiduciary duty; (8) breach of promissory note; (9) breach of guaranty; and (10) civil theft and conspiracy to commit civil theft pursuant to Fla. Stat. § 772.11. In an order dated January 22, 1998, this court dismissed Counts I and II of the amended complaint as to all Defendants, and it dismissed Count VII of the amended complaint as to all Defendants except Anderson. On July 1, 1999, after a contentious discovery period producing disputes that are still not fully resolved, the Garlands filed a motion for summary judgment as to Counts VIII and IX. Also on that date, Defendants filed three separate motions for summary judgment as to all counts.[3]

### B. *Initial Matters*

■ Because they affect the consideration and description of the relevant facts in this case, the court must initially address several issues concerning the procedural requirements that accompany the filing of a motion for summary judgment. This court's local rules require that the movant "attach to the motion a separate and concise statement of the material facts to which the movant contends there is no genuine issue to be tried." LR 56.1B(1), N.D. Ga. Moreover, "[a]ll documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment shall be clearly identified for the court." LR 56.1B(3), N.D. Ga.

---

1. The stipulation stated that "those claims filed in this (the Florida) action, which claims were also filed and are currently pending between the parties in the United States District Court for the Northern District of Georgia... will be deemed to have been filed in that forum on February 7, 1996, the date this action was commenced in Florida."

2. The Defendant companies are Advance Medical Funding L.P. II ("Advance L.P."), Advance Medical Funding Corp. ("Advance Corp."), Advance Medical Designs, Inc.

("AMD"), and Advance Textile Corp. ("Advance Textile"). The individual Defendants are Joseph R. Cottone, Sr. ("J.Cottone"), Charles J. Cottone ("C.Cottone"), Thomas Cottone ("T.Cottone"), and Tracy Anderson ("Anderson").

3. One motion was filed by Defendants Anderson and Advance Textile. The second motion was filed Defendants Advance L.P., Advance Corp., AMD, T. Cottone, and J. Cottone. The final motion was filed by Defendant C. Cottone.

Apparently attempting to comply with these rules, all parties in this case have filed separate factual statements with their motions for summary judgment. Only the Garlands and Defendants Anderson and Advance Textile, however, support their factual statements with citations to evidence in the record. The other Defendants have failed to do so, and as a result, their motions are not in compliance with the rules of this court. Accordingly, Plaintiffs urge the court to deny these motions as not properly supported. Defendants argue, however, that Fed.R.Civ.P. 56 allows a party to move for summary judgment with or without supporting affidavits, and therefore the motions are proper. Additionally, Defendants note that reference to deposition testimony and exhibits is made in the supporting memorandum.

The court finds Defendants' arguments to be unavailing. The purpose of the requirements that movants file separate statements of fact and that evidence relied upon be clearly identified is to allow the court to compare the factual statement with the evidence and determine whether or not particular inferences can be drawn by the factfinder. In other words, these requirements facilitate the court in evaluating whether or not there exists a genuine issue of material fact. The court should not be made to guess the sources of a movant's version of the relevant facts. Indeed, the movant has an "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–09 (11th Cir.1991) (noting that *Celotex* did not overrule prior precedent that movant had initial burden of showing absence of genuine issue of material fact and declining to address for first time on appeal whether that burden had been met because "[t]o do so would require us to

discharge the movant's Rule 56 responsibility of searching the record and identifying material in support of its motion"). Moreover, citations scattered throughout a legal brief do not comply with the requirement that sources be "clearly identified." LR 56.1B(3), N.D. Ga.

Another reason for disallowing an unsupported or "naked" fact statement is the nature of the appellate review process. The record created in the district court is the record considered by an appellate court. Imprecise and unsupported factual statements, which go to the very heart of a summary judgment determination, have a tendency to lead to imprecise and somewhat vague responses as the non-movant attempts to cover all the proverbial bases. As a result, the record created in the district court may be vague, which hinders expeditious review on appeal, Furthermore, while the appellate courts may in their discretion resolve questions on summary judgment that were not addressed by the district court, *see Clark*, 929 F.2d at 609, an unclear record runs the risk that either the district court will not consider all of the issues potentially raised or the appellate court cannot easily determine whether the issue was raised and addressed so as to evaluate whether it should exercise its discretion to review. Because of these deficiencies, the court DENIES the motions for summary judgment filed by Advance L.P., Advance Corp., AMD, T. Cottone, and J. Cottone and by C. Cottone.

In light of this ruling, the following facts are taken, except where otherwise indicated, from the statements of fact filed by the Garlands and Defendants Anderson and Advance Textile, as well as the responses thereto. These documents, however, are less than model examples of proper fact statements and responses. For example, several of the factual statements submitted by both Plaintiffs and Defendants constitute legal conclusions on issues to be tried in the case. Pursuant to Local Rule 56.1B(1), N.D. Ga., the court will not consider those statements. Also,

two of Plaintiffs' factual statements are not supported by citations to the record, and for the reasons discussed above, the court will not consider those statements either. Additionally, while most of the Defendants seek to controvert several of Plaintiffs' factual statements, most of their responses, with some exceptions, contain only the word "Denied." [4] To dispute a statement of fact under Local Rule 56, a respondent must do more than simply write the word "Denied." Rather, the rule requires that the respondent *specifically* controvert the moving party's statement of facts or else those statements shall be deemed admitted. LR 56.1B(2). In other words, the respondent must provide specific facts, supported by something more than mere denials or allegations, showing that a genuine issue exists to be tried. *See Sanders v. Nunley*, 634 F.Supp. 474, 476 (N.D.Ga. 1985) (Evans, J.) (interpreting predecessor to LR 56.1B(2)). *Cf. Tapley v. Collins*, 41 F.Supp.2d 1366, 1368 n. 1 (S.D.Ga.1999) (Edenfield, J.) ("[A] non-moving party does not controvert an evidentially supported Fact Statement merely by stating … that a factual assertion is 'denied' or 'controverted.' "). As such, those of Plaintiffs' factual statements that do not constitute legal conclusions and are properly supported by the record will be deemed admitted.

## C. *Facts*

The Garlands, citizens of Florida, are husband and wife and have been continuously married since before January 1, 1990. All of the Defendants, with the exception of Advance Textile, are citizens of Georgia. Advance Textile is organized under the laws of the Northern Mariana Islands. (Def. Advance Textile's Ans. to Am. Complaint, ¶ 12). In 1992 and 1993, the Garlands invested a total of $168,750 in the stock of Advance Textile. The Garlands made these investments by writing: (1) a check dated July 8, 1992 in the amount of $37,500; (2) a check dated August 30, 1992 in the amount of $37,500; (3) a check dated October 7, 1993 in the amount of $70,000; and (4) a check dated October 15, 1993 in the amount of $23,750. Laura Garland stated that the Garlands delivered these checks to Anderson in Florida. (Dec. of L. Garland in Opposition to Motions for Summary Judgment ["L. Garland Dec."], ¶ 9). Anderson served as Vice–President and Director of Advance Textile and as a limited partner of Advance L.P. (Def. Anderson's Ans. to Am. Complaint, ¶ 17). The Garlands also stated that the first two checks, written in 1992, were for 75,000 shares of Class I Preferred Stock and that the final two checks, written in 1993, were for 75,000 shares of Class II Preferred Stock. (L. Garland. Dec., ¶ 5; Dec. of P. Garland in Opposition to Motions for Summary Judgment ["P. Garland Dec."], ¶ 5).

Prior to writing the checks, the Garlands discussed the investments with Anderson. Most of these discussions took place in Tallahassee, Florida, although some occurred in Atlanta and at least one other occurred in Sky Valley, Georgia. The Garlands testified that Anderson was a close friend and assured them: that their investments were safe and 100% guaranteed; that Advance Textile had a significant edge over the competition with regard to the price of labor; and that the value of the land owned by Advance Textile exceed-

---

4. Defendant C. Cottone did not file a response to Plaintiffs' statement of facts. Defendant Anderson's responses attempting to controvert Plaintiffs' factual statements contain only the word "Denied." Defendants Advance L.P., Advance Corp., AMD, T. Cottone, and J. Cottone also seek to controvert some of Plaintiffs' statements by simply using the word "Denied," but they also sometimes offer an explanation for the denial. None of these explanations, however, contain citations to

the record. The local rules of this court require both movants and non-movants to clearly identify the materials relied upon. Moreover, Rule 56 requires a non-movant to designate "specific facts showing that there is a genuine issue for trial," and to do so by going beyond the pleadings and by providing references to affidavits, depositions, answers to interrogatories, and admissions on file. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

ed the value of all the investments made in the company. (*See, e.g.,* P. Garland Depo., pp. 33–36; L. Garland Depo., pp. 15–18). Paul Garland, however, testified that he did nothing to scrutinize the information provided by Anderson, nor had he "been smart enough" to conduct due diligence. (P. Garland Depo., pp. 35, 101–02). Rather, he strictly relied on and trusted the things told to him by Anderson. (*Id.*). Similarly, Laura Garland testified that she did not seek financial advice from anyone concerning the investments before investing in Advance Textile. (L. Garland Depo., p. 64). It is undisputed that Anderson invited the Garlands to travel to the Northern Mariana Islands, to visit the Advance Textile facility, but the Garlands declined the invitation. Paul Garland testified that he decided not to go to Saipan primarily because it would take a good deal of time out of his work schedule, whereas Laura Garland testified that she declined Anderson's invitation because she does not like to fly. (P. Garland Depo., p. 31; L. Garland Depo., pp. 73–74).

It is likewise undisputed that the Garlands executed an "Accredited Investor Questionnaire" on July 8, 1992, as well as a "Stock Subscription Agreement" on July 12, 1992. The Garlands also received a "Confidential Private Offering Memorandum and Business Plan" at some point, although the Garlands stated that they did not receive this memorandum until after they had invested. (L. Garland Dec., ¶ 14; P. Garland Dec., ¶ 14). The Garlands stated that they did not read either the memorandum or the subscription agreement. (L. Garland Dec., ¶ 6 and 14; P. Garland Dec., ¶ 6 and 14). The Garlands further stated that they did not, at any time, sign an Accredited Investor Questionnaire or a Stock Subscription Agreement, or receive a Confidential Private Offering Memorandum and Business Plan, with regard to the purchases of the Class II stock made in 1993. (L. Garland Dec., ¶ 7 and 15; P. Garland Dec., ¶ 7 and 15). The private offering memorandum contained a section entitled "Risk Factors." (Ex. 2 to L. Garland Depo., pp. 15–21).

During February 1993, Advance L.P., by and through its general partner, Advance Corp., executed and delivered a promissory note ("the note" or "the Advance L.P. note") to the Garlands, in the principal amount of $100,000, in exchange for the Garlands' $100,000 investment in Advance L.P. The note was delivered to the Garlands in Florida. On February 12, 1993, the Garlands executed an "Accredited Investor Questionnaire" concerning the note. (Def. St. of Facts, Ex. C). Laura Garland stated, however, that she and her husband signed this questionnaire after they had made their investment in Advance L.P. (L. Garland Dec., ¶ 3). In any event, Paul Garland testified that he did not read the questionnaire. (P. Garland Depo., p. 84). Also on February 12, 1993, J. Cottone, T. Cottone, C. Cottone, Anderson, and Advance Corp. executed and delivered to the Garlands a personal guaranty ("the guaranty") of the obligations made by Advance L.P. under the note. (Plaintiff's Statement of Facts, Ex. B). The guaranty, like the note, was delivered to the Garlands in Florida.

According to the terms of the note, payment was to be made to the Garlands in Florida, or to any other place as the Garlands and Advance L.P. designated in writing. (Pl. St. of Facts, Ex. A, ¶ 11). The note also indicated that it could not be assigned or transferred except upon the occurrence of certain conditions precedent, specifically, an effective registration statement with respect to the note under the applicable federal and state securities laws, or an opinion of counsel that such a transaction was exempt from or otherwise in compliance with those laws such that a registration statement was not required. (*Id.* at Ex. A, ¶ 14). Additionally, the note contained language whereby Advance L.P. and all guarantors waive presentment "for payment, demand, notice of nonpayment, protest, notice of protest and all other notices, filing of suit, and diligence in collecting this Note, or in enforcing the Lender's rights under any guaranties." (*Id.* at Ex. A, ¶ 12). The note incorporated by

reference a document entitled "Note Subscription and Loan Agreement," although this document was never executed by Plaintiffs. (Def. St. of Facts, Ex. E). The Garlands currently have physical possession of the note.

The Garlands additionally received a "Confidential Private and Limited Offering Memorandum" concerning the note, although the Garlands stated that they did not receive this memorandum until well after they made their investment in Advance L.P. (L. Garland Dec., ¶ 4; P. Garland Dec., ¶ 4). This memorandum, like the one earlier received by Plaintiffs, contained a section entitled "Risk Factors." (Ex. 22 to Anderson Depo., pp. 26–31). The Garlands did not read the memorandum, and Paul Garland testified that Anderson told him that the Cottones were involved in Advance L.P., as they were in Advance Textile, and that Paul Garland should therefore feel comfortable with his investment in Advance L.P. Paul Garland further testified that he did not try to obtain any information on the Cottones until after the instant lawsuit was underway. (P. Garland Depo., pp. 46–47).

On December 9, 1993, Paul Garland and Anderson were in the airport in Tallahassee awaiting Anderson's scheduled flight from Tallahassee to Atlanta. Pursuant to Anderson's recommendations and instructions, Paul Garland signed certain instruments ("the Peninsula instruments") related to Peninsula L.P. I ("Peninsula"), a Georgia limited partnership organized by Anderson in the fall of 1993 to buy out the stock holdings of certain members of the Cottone family in Advance Textile. The Peninsula instruments signed by Paul Garland included a "Peninsula L.P. I Subscription Agreement," an "Accredited Investor Questionnaire," and a "Contribution, Assignment, and Transfer Agreement" between Paul Garland and Peninsula. According to the terms of the subscription agreement, Paul Garland made a subscription of 100 units of Peninsula stock, at a price of $1,000 per unit. (Def. St. of Facts, Ex. H, ¶ 1). The subscription agreement also provided that the purchase of the

Peninsula stock was to be paid for either by tendering the Advance L.P. note or by a full cash payment of $100,000. (Id.). Additionally, the transfer agreement states that the transferor, identified as Paul Garland, "does hereby transfer, assign, contribute, convey and set over to Transferee, and Transferee's successors and assigns, as Transferor's contribution to the capital of Transferee, all of Transferor's rights, title and interest in and to, and all rights, entitlements, powers and privileges conferred under, the Note." (Def. St. of Facts, ¶ 1). In return for the transfer of the note, the transferee, identified as Peninsula, agreed to issue, sell, and deliver 100 units of Peninsula stock at the price of $1,000 per unit. (Id.).

Paul Garland did not read the Peninsula instruments before he signed them and was otherwise unaware of their content. Moreover, Anderson did not inform Paul Garland, at the time he signed the Peninsula instruments, that the execution of those documents would have the purported effect of canceling the personal guaranty provided by Anderson and the others as to the Advance L.P. note. Paul Garland testified, however, that Anderson told him the agreements transferred his interest in Advance L.P. to Advance Textile. (P. Garland Depo., p. 57). Laura Garland did not execute any of the Peninsula instruments on December 9, 1993 or at any time thereafter. Anderson, however, testified that Paul Garland informed him that Paul Garland was authorized to sign for his wife. (Anderson Depo., p. 111). Paul Garland disputes that he told Anderson that he was authorized to sign for his wife, and he stated in his declaration that he in fact was not authorized to sign on his wife's behalf. (P. Garland Dec., ¶ 21). Paul Garland testified that he believed he told his wife that he signed the Peninsula instruments within a week of doing so, but Laura Garland stated that her husband did not so inform her. (P. Garland Depo., p. 58; L. Garland Dec., ¶ 26).

Neither Advance L.P. nor Advance Corp. currently has any assets. Sometime in July 1994, Defendants attempted to buy, back the Garlands' $100,000 interest in the Advance L.P. note. The offer was made through attorney Steven Cunningham, who has represented Advance Textile, Advance L.P., Advance Corp., and Peninsula. (*See* Cunningham Depo., pp. 4–5).

## II. DISCUSSION

### A. *Choice of Law*

Defendants Anderson and Advance Textile initially argue that the court should enter summary judgment in their favor as to all of the remaining claims against them because Georgia law applies to each of those claims and Plaintiffs have only alleged violations of Florida law. *See* Amended Complaint, ¶¶ 2–3 (stating that claims arise under Florida statutory and common law). Plaintiffs respond by stating that the court has already decided that they have stated valid claims for relief, regardless of which state's laws apply. Moreover, Plaintiffs contend that by arguing under Florida law in their motions to dismiss, Defendants have waived any argument that Georgia law applies to this dispute. Additionally, Plaintiffs contend that, even if Defendants have not waived their arguments concerning the application of Georgia law, Florida law nonetheless applies under Georgia's conflicts of law rules. Finally, Plaintiffs argue that it would be inequitable and prejudicial to grant summary judgment in favor of Defendants on this basis given the fact that the Garlands' action in Florida state court was dismissed on grounds of *forum non conveniens*.

A federal district court must apply the conflicts of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Georgia courts follow the approach embodied in the First Restatement of Conflict of Laws, employing the traditional rules of *lex loci contractus* and *lex loci delicti*. *See Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir.1998).

Under the first of these rules, *lex loci contractus*, "the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made." *Lloyd v. Prudential Sec., Inc.*, 211 Ga.App. 247, 248, 438 S.E.2d 703 (1993); *see also Southeastern Express Sys., Inc. v. Southern Guaranty Ins. Co. of Georgia*, 224 Ga.App. 697, 702, 482 S.E.2d 433 (1997) (applying *lex loci contractus* to choice of law issue). Similarly, under the rule of *lex loci delicti*, "tort cases are governed by the substantive law of the state where the tort was committed." *Lloyd*, 211 Ga.App. at 248, 438 S.E.2d 703. Despite their adherence to these rules, however, Georgia courts recognize that "parties by contract may stipulate that the laws of another jurisdiction will govern the transaction." *Manderson & Assoc., Inc. v. Gore*, 193 Ga.App. 723, 725, 389 S.E.2d 251 (1989). Such stipulations are enforced, unless the law of the other jurisdiction is contrary to Georgia public policy or the chosen jurisdiction has no substantial relationship to the parties or the transaction. *Id.*

The promissory note and guaranty upon which Counts VIII and IX of Plaintiffs' complaint are based contain choice-of-law provisions. The note provides that "Lender and Borrower hereby expressly acknowledge and agree that the laws of Alabama ... shall govern any claim of usury hereunder," but that "[a]ll other matters pertaining to this Note shall be construed and enforceable in accordance with and governed by the laws of the State of Georgia." (Pl. St. of Facts, Ex. A, ¶ 13(c)). The guaranty similarly provides that it will "be subject to, governed by, and construed in accordance with, the laws of the State of Georgia." (*Id.* at Ex. B, ¶ 8). Application of Georgia law to these documents would certainly not violate Georgia public policy, and Georgia has a substantial relationship to the parties in this case. Moreover, Plaintiffs have all but conceded that the choice-of-law provisions contained in these documents are valid, arguing that "[p]erhaps with the exception of Counts VIII

and IX . . . , all of the Garlands' remaining claims are governed by Florida law under Georgia's *lex loci*." Pl. Brief in Resp. to Def. Mot., p. 8. Therefore, Georgia law governs Plaintiffs' claim for breach of promissory note and breach of guaranty.

■ The court, however, finds without merit Defendants' argument that Plaintiffs have failed to state a claim upon which relief can be granted. While it remains true that the Garlands' complaint states that these claims arise under Florida law, the complaint gives Defendants adequate notice of the claims at issue, no matter which law applies, and Defendants therefore will suffer no prejudice by allowing these claims to proceed. *Cf. Brown v. Nichols*, 8 F.3d 770, 773 (11th Cir.1993) (noting the "liberality of the principles of notice pleading that govern federal procedure"). Moreover, "[i]t is a well-settled principle of law that a complaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief *on any possible theory*." *Bowers v. Hardwick*, 478 U.S. 186, 201, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Blackmun, J., dissenting) (emphasis added); *see also Due v. Tallahassee Theatres, Inc.*, 333 F.2d 630, 631 (5th Cir.1964) (holding that complaint may not be dismissed if it alleges facts that, under any theory of law, would entitle plaintiff to relief).[5] Applying the foregoing principle to the instant case, the court finds that Plaintiffs have stated valid claims under Georgia law, allegations that those claims arise under Florida law notwithstanding, and Defendants are not entitled to summary judgment simply because the facts do not support the exact legal theory alleged. *See also Seeley v.*

*Brotherhood of Painters, Decorators, and Paper Hangers of America*, 308 F.2d 52, 58 (5th Cir.1962) (indicating that plaintiff's legal theory in stating claim "is not so important").

■ Plaintiffs' remaining claims all sound in tort. Therefore, the choice-of-law provisions found in the promissory note and guaranty do not apply to those claims, and the court must address which state's law does apply. With respect to Plaintiffs' state law securities claims, the court has already addressed this issue in its July 20, 1999 order denying Defendants' motion for judgment on the pleadings.[6] In that order, the court noted that the weight of the legal authority indicates that conflicts of law principles are not applicable in cases involving state Blue Sky laws. Consequently, the court found that the pertinent question in such cases is whether there was a sufficient territorial nexus between the state at issue and the transaction. In the instant case, Plaintiffs have offered evidence that they are residents of Florida, that most of the discussions with Anderson concerning their investments took place in Tallahassee, that they delivered the checks related to the Advance Textile investments to Anderson in Florida, that the promissory note and guaranty related to the Advance L.P. investment were delivered to them in Florida, and that Paul Garland executed the instruments related to the Peninsula transaction in the Tallahassee airport. Therefore, as indicated in the court's earlier opinion, there exists a sufficient nexus with Florida to apply the FSIPA. *See Petrites v. J.C. Bradford & Co.*, 646 F.2d 1033 (5th Cir. Unit B 1981) (finding sufficient contacts with Florida to apply FSIPA when purchaser of securities was resident of Florida, reports of transactions and monthly statements were sent to

5. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions that the former Fifth Circuit rendered prior to October 1, 1981.

6. In that order, the court similarly disposed of Plaintiffs' argument that Defendants waived

any choice of law issues by arguing their motions to dismiss under Florida law. For the reasons articulated in that opinion—that Defendants were merely arguing that, even if Florida law applied, Plaintiffs' claims were still barred—the court finds the argument unpersuasive and will not address it further.

Florida, checks for payment were sent from Florida, and two account contracts were signed in Florida).

With regard to Plaintiffs' claims for fraud in the inducement, negligent misrepresentation, breach of fiduciary duty, and civil theft and conspiracy, the rule of *lex loci delicti* provides for the application of Florida law. Under Georgia law, "the place of wrong, the locus delicti, is the place where the injury sustained was suffered rather than the place where the act was committed, or, as is sometimes more generally put, it is the place where the last event necessary to make an actor liable for an alleged tort takes place." *Risdon Enters. v. Colemill Enters.*, 172 Ga.App. 902, 903, 324 S.E.2d 738 (1984). It appears, then, that Georgia law states the rule in two different ways: the place of the wrong is either the jurisdiction where the harm was suffered or the jurisdiction where the last event necessary for liability occurs. "In most instances, these semantical variances are of no practical consequence, because the actual situs of the injury and the location of the 'last event' causing the injury are usually the same." *Management Science America, Inc. v. NCR Corp.*, 765 F.Supp. 738, 739 (N.D.Ga. 1991) (Forrester, J.) (internal quotations and citations omitted). As this court has previously stated, however, "when... the injury can arguably be said to be sustained in more than one state, application of the *lex loci delicti* rule becomes much more problematic." *Id.*

The court has found no Georgia state court decision applying the *lex loci delicti* rule to the tort of fraud or misrepresentation. Looking to other jurisdictions that apply the rule of *lex loci delicti* in tort actions, however, this court has previously determined that the place of the

injury is where the economic loss occurred rather than the state where the fraudulent misrepresentations were made. *Id.* at 739–40. The Eleventh Circuit, applying Georgia law, has apparently reached the same conclusion. *See Velten v. Regis B. Lippert, Intercat, Inc.*, 985 F.2d 1515, 1521 (11th Cir.1993) (finding that harm occurred in Georgia where plaintiff resided in Georgia). In the instant action, the Garlands resided at all relevant times in Florida and bore the economic impact of the alleged torts in Florida. Therefore, any harm suffered as a result of the fraud, misrepresentation, fiduciary breach, or civil theft occurred in Florida. Similarly, the Garlands' detrimental reliance is the last event necessary to make Defendants liable, and their reliance and any damages attributable thereto occurred in Florida. *Accord id.* Florida law consequently controls Plaintiffs' tort claims under either statement of the *lex loci delicti* rule, and the complaint adequately alleges violations of Florida law.[7] As such, Defendants are not entitled to summary judgment in this regard.[8]

## B. Statute of Limitations Concerning Plaintiffs' State Law Securities Claims

Defendants next argue that, even if Florida law applies to Plaintiffs' state securities fraud claims, Georgia's two-year statute of limitations bars the Garlands' claims under the FSIPA. Georgia courts generally follow the rule of *lex loci fori*, which states that "procedural or remedial questions are governed by the law of the forum, the state in which the action is brought." *Lloyd*, 211 Ga.App. at 248, 438 S.E.2d 703. Furthermore, statutes of limitation "[limit] the time in which a party may bring an action for a right which has already accrued," and as such,

7. In light of this ruling, the court need not address Plaintiffs' argument that the dismissal of their state court action on *forum non conveniens* grounds precludes summary judgment in favor of Defendants.

8. With regard to Plaintiffs' tort claims, each of which is premised on fraud, the court is

currently of the opinion that the jury will need to consider each episode of alleged fraud or misrepresentation separately in order to decide liability. The court, however, will consider briefs by the parties to the extent that they show this opinion to be incorrect.

"look only to the remedy and so are procedural." *Id.* (internal quotations and citations omitted). The Supreme Court of Georgia, however, has held that an exception exists to the general rule when a statute creating or conferring a right not found at common law also limits the duration of that right to a prescribed time. *See O'Shields v. Georgia Pacific Ry. Co.*, 83 Ga. 621, 625, 10 S.E. 268 (1889). Subsequent decisions by that court reveal that this exception applies only when the foreign limitations period is shorter than that of the forum state. *See, e.g., Taylor v. Murray*, 231 Ga. 852, 853, 204 S.E.2d 747 (1974) ("[W]here the foreign statute creating a cause of action not known to the common law prescribes a *shorter* period in which action may be commenced than that prescribed by the law of the place where action is brought, the former . . . governs . . . .") (emphasis added). *See also Indon Indus. v. Charles S. Martin Distrib. Co.*, 234 Ga. 845, 848, 218 S.E.2d 562 (1975) (relying on *Taylor* to apply foreign limitations period where statute creating right not found at common law also prescribed limitations period shorter than that found under Georgia law); *Crites v. Delta Air Lines, Inc.*, 177 Ga.App. 723, 724, 341

S.E.2d 264 (1986) (holding that exception created in *O'Shields* applies only where foreign limitations period is shorter than that of forum). The inquiry, therefore, concerns whether or not the FSIPA creates a right not found at common law and, if so, whether its statute of limitations is shorter than the analogous Georgia limitations period.[9]

■ The court has found no Georgia cases that conclude that securities fraud statutes such as Fla. Stat. § 517.301 create or confer rights different from those found at common law. The United States Supreme Court, however, has repeatedly indicated that actions under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, are distinct from common law claims of fraud, deceit, and misrepresentation. *See, e.g., Basic, Inc. v. Levinson*, 485 U.S. 224, 244 n. 22, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 388–89, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 744–45, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Because the text of Fla. Stat. § 517.301 is virtually identical to that of Rule 10b–5,[10] the court

9. In a previous order in this case, the court found that the FSIPA may apply in its entirety, even as to statute of limitations issues, because the court's application of Florida's Blue Sky law did not rest on traditional conflicts of law principles. Upon further consideration, the court finds that such an independent determination is not properly made by a federal court and that its analysis with regard to which state's limitations period should apply must conform to the analysis that would be conducted by the Georgia state courts. *Klaxon*, 313 U.S. at 496, 61 S.Ct. 1020.

10. The text of Rule 10b–5 reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5. Similarly, section 517.301 provides:
(1) It is unlawful and a violation of the provisions of this chapter for a person:
(a) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of § 517.051 and including any security sold in a transaction exempted under the provisions of § 517.061, directly or indirectly:
1. To employ any device, scheme, or artifice to defraud;
2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact

finds that § 517.301 creates or confers rights different from those found at common law.

The limitations period applicable to § 517.301 does not govern the instant dispute, however, because that limitations period is longer than the analogous statute of limitations under Georgia law. Florida law provides for a two-year limitations period for "[a]n action founded upon a violation of any provision of chapter 517, with the period running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence, but not more than 5 years from the date such violation occurred." Fla. Stat. § 95.11(4)(e). By contrast, the limitations period applicable to Georgia's securities fraud statute provides that "[w]ith respect to the purchase, sale, or other offer to purchase or sell a security, no person may sue under this Code section more than two years from the date of the contract for sale or sale, if there is no contract for sale." O.C.G.A. § 10–5–14(d); *see also Fuller v. Dreischarf,* 238 Ga.App. 18, 18–19, 517 S.E.2d 89 (1999) (applying § 10–5–14(d) to bar securities fraud claims brought under Georgia Securities Act). A review of the two limitations provisions reveals that, where Georgia's statute prescribes a two-year period starting from the time of either the contract or the sale, Florida's statute allows the two-year period to run from the time the fraud was discovered or should have been discovered. Because the date of discovery could be more than two years after the date of the contract or sale, Florida's statute provides for a longer limitations period, and Georgia's statute of limitations therefore applies. *See Taylor,* 231 Ga. at 854, 204 S.E.2d 747 (stating that "a statute admitting the bar of the law of any other state or country does not so adopt the foreign law as to lengthen the limitation period otherwise prescribed in the forum").

The Garlands' FSIPA claims are premised on their investments in Advance Textile and Advance L.P. *See* Amended Complaint, ¶¶ 66–67, 72–73. The Garlands purchased shares of Advance Textile stock on July 8, 1992, August 30, 1992, October 7, 1993, and October 15, 1993. The exact date of the Advance L.P. investment is not clear, but both of the Garlands stated that the investment occurred in or about February 1993. (Declaration of Laura Garland in Support of Plaintiffs' Motion for Summary Judgment, ¶ 5; Declaration of Paul Garland in Support of Plaintiffs' Motion for Summary Judgment, ¶ 5). The Garlands, however, did not file their state court action alleging FSIPA violations until February 6, 1996, more than two years after each of the aforementioned dates. As such, it appears that Plaintiffs' FSIPA claims are barred under O.C.G.A. § 10–5–14(d).

Plaintiffs argue that the fraud underlying their FSIPA claims tolled the limitations period, pursuant to O.C.G.A. § 9–3–96, and that their confidential relationship with Anderson excuses any failure to exercise reasonable diligence to discover the fraud. Section 9–3–96 provides that, where a defendant is guilty of fraud by which the plaintiff has been deterred from bringing suit, "the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." This tolling provision "consists of three elements: (1) actual fraud on the part of the defendant involving moral turpitude, (2) which conceals the existence of a cause of action from the plaintiff, and (3) plaintiff's reasonable diligence in discovering his cause of action despite his failure to do so within the time of the applicable statute of limitations." *Jim Walter Corp. v. Ward,* 245 Ga. 355, 357, 265 S.E.2d 7 (1980). Where, as here, actual fraud is the gravamen of the action, "the statute of limitations is tolled until the fraud is discovered or by reason-

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

able diligence should have been discovered" and "[n]o independent fraudulent act is required to toll the statute." *Shipman v. Horizon Corp.*, 245 Ga. 808, 267 S.E.2d 244 (1980); *see also Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 847, 507 S.E.2d 411 (1998). The failure to use reasonable diligence may be excused, however, "where there exists some relation of trust and confidence ... between the party committing the fraud and the party who is affected by it ...." *Brown v. Brown*, 209 Ga. 620, 621, 75 S.E.2d 13 (1953).

In this case, it is undisputed that neither of the Garlands took steps to scrutinize the information provided to them by Anderson or consulted independent advisers. It therefore appears that they failed to act with reasonable diligence so as to toll the statute of limitations. *See, e.g., Fuller*, 238 Ga.App. at 20, 517 S.E.2d 89 (finding that plaintiffs had not acted with due diligence where they "uncritically accepted the word of defendant" and failed to investigate or confirm certain representations); *Stricker v. Epstein*, 213 Ga.App. 226, 229, 444 S.E.2d 91 (1994) (finding that plaintiffs failed to exercise due diligence where evidence existed that something was wrong but plaintiffs failed to inquire). The Garlands contend that *Fuller* and *Stricker* are inapposite to this case because in neither of those cases did the court find the existence of a fiduciary or confidential relationship, whereas they contend such a relationship exists here. Specifically, the Garlands stated that they had known Anderson since 1988, that Anderson was a close personal friend and advisor, that they often took trips together, and that Anderson invited the Garlands to repose trust in him by assuring them that he would not allow them to become involved in any investments until he was absolutely certain such investments were safe. (P. Garland Dec., ¶¶ 11–14; L. Garland Dec., ¶¶ 11–14; P. Garland Depo., pp. 26, 28–29, 32–34; L. Garland Depo., pp. 16–19, 64–65, 75).

After reviewing Georgia law, the court finds that the Garlands have not demonstrated the existence of a confidential relationship between Anderson and themselves. Georgia law provides;

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

O.C.G.A. § 23–2–58. The Supreme Court of Georgia has interpreted this statute "to say that although some confidential relationships are created by law and contract (e.g., partners), others may be created by the facts of the particular case." *Cochran v. Murrah*, 235 Ga. 304, 306, 219 S.E.2d 421 (1975). The mere fact that one party reposed trust and confidence in the other does not create a confidential relationship. *Thomas v. Eason*, 208 Ga. 822, 827, 69 S.E.2d 729 (1952). Rather, the facts must demonstrate a relationship "which justifies the reposing of confidence by one party in another." *Cochran*, 235 Ga. at 307, 219 S.E.2d 421. A review of Georgia case law on the subject reveals that such relationships generally involve some sort of formal affiliation between the parties. *See, e.g., Bryan v. Norton*, 245 Ga. 347, 348, 265 S.E.2d 282 (1980) (finding that confidential relationship could exist between clergyman and church member); *Cochran*, 235 Ga. at 307–08, 219 S.E.2d 421 (holding that confidential relationship can be found between employer and employee); *Harrison v. Harrison*, 214 Ga. 393, 394, 105 S.E.2d 214 (1958) (finding that confidential relationship exists between principal and agent); *Sutton v. McMillan*, 213 Ga. 90, 94, 97 S.E.2d 139 (1957) (concluding that, while siblings are not in confidential relationship by virtue of family relation, confidential relationship could exist where one sibling was experienced and educated businessman who acted on behalf of his uneducated and ill sister); *Dorsey v. Green*, 202 Ga.

655, 659, 44 S.E.2d 377 (1947) (finding that confidential relationship exists between executor of will and devisees); *Crosby v. Rogers*, 197 Ga. 616, 622, 30 S.E.2d 248 (1944) (holding that partners stand in confidential relationship to one another). On the other hand, friendship between the parties "would not alone create a relation of trust and confidence between them." *Norris v. Hart*, 74 Ga.App. 444, 446, 40 S.E.2d 96 (1946).

In this case, the Garlands have offered evidence demonstrating that Anderson was their personal friend and had conducted business with Paul Garland on matters not relating to investments. This evidence is not sufficient to establish a confidential relationship between the parties so as to justify the Garlands reposing trust in Anderson. *Cf. First American Bank v. Bishop*, 239 Ga. 809, 239 S.E.2d 19 (1977) ("A confidential relationship does not arise between a bank officer and the bank's customer merely because they are brothers-in-law and have had loan transactions in the past."). Accordingly, because the Plaintiffs failed to exercise reasonable diligence in discovering the fraud, and because they have not demonstrated the existence of a confidential relationship to excuse that failure, they cannot toll the statute of limitations. As such, the court GRANTS Defendants' motion for summary judgment in this regard.

### C. *Claims Based on the Advance L.P. Investment*

 Defendants contend that the Garlands, via Paul Garland's execution of the Peninsula instruments, transferred their interest in the Advance L.P. promissory note and therefore have no claims for breach of the note, for breach of the guaranty, or for any of their other claims insofar as those claims are based on the Advance L.P. investment. Defendants accordingly move the court to enter summary judgment in their favor on these claims. Plaintiffs, however, contend that Paul Garland's execution of the Peninsula instruments was ineffective to assign or transfer the note because the Garlands held the note as tenants by the entirety, and Laura Garland neither executed the Peninsula instruments nor authorized her husband to sign on her behalf. Plaintiffs further argue that they never executed any release of liability concerning either the note or the guaranty, and they maintain that the conditions precedent to an effective assignment of the note were in any event not satisfied. Based on these arguments, Plaintiffs also move for summary judgment as to their claims for breach of promissory note and breach of guaranty.

It is undisputed that Paul Garland executed the Peninsula instruments and that those instruments purport to transfer the promissory note in exchange for a $100,000 interest in Peninsula. It is also undisputed that Laura Garland did not sign any of the Peninsula instruments. Whether or not Paul Garland was authorized to sign on his wife's behalf, however, is heavily disputed. Defendants argue that, even if the Garlands held the note as tenants by the entirety, Florida law allows one tenant himself to transfer property held by the entirety. In support of this argument, Defendants cite *Thelma C. Raley, Inc. v. Kleppe*, 867 F.2d 1326 (11th Cir.1989). In that case, the Eleventh Circuit affirmed a district court decision, after trial, that there was sufficient evidence that one of the appellants consented to an agreement to split profits from the sale of certain real property, which agreement was signed by the appellant's husband but not by her. Relevant to the court's opinion were the frequent use of the wife's name and the plural pronoun in documents related to the agreement, evidence that the husband generally handled the family's legal affairs, evidence that the husband handled the listing of the property with his wife's consent, and that the husband alone approached the other party about the terms of the agreement. *Id.* at 1328–29. In the instant case, which is at the summary judgment stage, Laura Garland is not mentioned in the Peninsula instruments. In fact, while the Accredited Investor Questionnaire and the

Subscription Agreement contain lines for the signature of a spouse or co-subscriber, these lines are not filled in, and the Contribution, Assignment, and Transfer Agreement identifies Paul Garland alone as the transferor. *See* Def. St. of Facts, Ex. G, H, and I. Moreover, there is conflicting evidence as to whether Paul Garland was authorized to sign on behalf of his wife. *Compare* Anderson Depo., p. 111, *with* P. Garland Dec., ¶ 21 *and* L. Garland Dec., ¶¶ 20–23. As such, the court finds that Defendants are not entitled to summary judgment on this basis.

Similarly, Plaintiffs are not entitled to summary judgment. First, although Plaintiffs contend that the conditions precedent to transfer—the filing of a registration statement or an opinion of counsel that such need not be filed—were not satisfied, they have not supported their contention with evidence in the record.[11] As such, they have not met their initial burden and are not entitled to summary judgment on this basis. Additionally, Plaintiffs have not conclusively established that they held the note as tenants by the entirety. Because the Garlands acquired the promissory note while domiciled in Florida, and because all of the parties have briefed the issue under Florida law, the court will apply Florida law to determine the nature of the Garlands' ownership interest in the note.

Under Florida law, a tenancy by the entirety is created when there exists: (1) unity of possession (joint ownership and control); (2) unity of interest (the interests of each tenant are the same); (3) unity of title (the interests originate in the same transaction); and (4) the unity of marriage. *See Sackett v. Shahid,* 722 So.2d 273, 275 (Fla. 1st DCA 1998). Addi-

tionally, the Supreme Court of Florida has indicated that, with respect to personal property, "not only must the form of the estate be consistent with entirety requirements, but the intention of the parties must be proven." *First Nat'l Bank of Leesburg v. Hector Supply Co.,* 254 So.2d 777, 780 (Fla.1971). One of the reasons for this requirement in the context of personal property, as opposed to real property, "is that the application of the entireties concepts to personalty becomes exceedingly complex as the nature of the personalty increases in sophistication, and the judicial mind seeks to require greater safeguards lest the tenancy be abused." *Id.* Accordingly, "[w]hen a husband and wife acquire personal property in their joint names, no presumption arises that a tenancy by the entireties has been created." *Sackett,* 722 So.2d at 275. Furthermore, whether or not a tenancy by the entirety is created is determined by the facts of each case. *See id.* at 277.

The record contains no conclusive evidence that the Garlands intended to hold the Advance L.P. note as tenants by the entirety. In fact, as Defendants point out, one of the signature lines on the Accredited Investor Questionnaire executed by the Garlands with respect to the Advance L.P. investment characterizes the investment as a joint tenancy. Def. St. of Facts, Ex. C. Additionally, Paul Garland testified that he understood that his execution of the Peninsula instruments would transfer his interest in Advance L.P. (P. Garland Depo., p. 57). Such testimony is inconsistent with an intent to hold the note as tenants by the entirety because "[n]o interest in the entireties property can be conveyed to a third party without the other spouse's assent." *In re Koesling,* 210 B.R. 487, 489

---

11. While Plaintiffs attach the responses of Defendants Advance L.P., Advance Corp., AMD, T. Cottone, and J. Cottone to Plaintiffs' second request for admissions, this document does not meet their burden. Even though the aforementioned Defendants admit that no registration statement was filed, they deny that an opinion of counsel was not obtained. *See* Defendants' Responses to Plaintiffs' Sec-

ond Request for Admissions, ¶¶ 37, 38. Additionally, the citation to these responses, while contained in their brief, is not clearly identified in Plaintiffs' statement of undisputed facts. *See* Pl. St. of Facts, ¶¶ 19, 20. Therefore, as previously discussed, these two fact statements are in violation of this court's local rules and will not be considered.

(N.D.Fla.1997) (applying Florida law). Additionally, the inferences that can be drawn from the Garlands' investments in Advance Textile are conflicting. On the one hand, as Defendants point out, at least some of those investments were originally titled in Paul Garland's name only. *See* P. Garland Depo., 42–43; L. Garland Depo., pp. 127–29. When Laura Garland discovered this, the Garlands had the Advance Textile investments retitled in her name only. *Id.* A finder of fact could conclude from this evidence that the Garlands did not intend to hold their investments jointly, as either tenants by the entirety or as joint tenants. On the other hand, Paul Garland also testified that, because Florida is a state where "all property is owned jointly by a married couple," it did not matter to him how the documents were titled. P. Garland Depo., p. 43. This evidence indicates that the Garlands thought their investments would be held jointly no matter how they were titled, and it therefore could support an inference that Plaintiffs did in fact intend to hold the Advance L.P. note as tenants by the entirety. The court finds that a genuine issue of material fact exists as to the Garlands' intent in this regard and, consequently, as to the validity of Paul Garland's transfer of the note by signing the Peninsula instruments. Because factual issues exist concerning both the Garlands' intent and whether Paul Garland was authorized to act on behalf of his wife, the court hereby DENIES Defendants' motion for summary judgment as to this issue and DENIES Plaintiffs' motion for partial summary judgment.[12]

**D. Justifiable Reliance With Regard to Plaintiffs' Fraudulent Inducement and Negligent Misrepresentation Claims**

Defendants also contend that Plaintiffs cannot establish the required elements of their claims for fraudulent inducement or negligent misrepresentation because each of those claims requires Plaintiffs to prove that they justifiably relied upon the alleged misrepresentations. *See Hillcrest Pacific Corp. v. Yamamura*, 727 So.2d 1053, 1055 (Fla. 4th DCA 1999) (setting out elements of fraudulent inducement); *Baggett v. Electricians Local 915*, 620 So.2d 784, 786 (Fla. 2d DCA 1993) (setting out elements of negligent misrepresentation). Defendants argue that it is undisputed that the Garlands did not conduct due diligence, and therefore they cannot establish justifiable reliance. In response, Plaintiffs assert that determining whether an investor's reliance was justified requires consideration of a host of factors, none of which is dispositive. Furthermore, Plaintiffs contend that the Garlands were in a confidential relationship with Anderson and that fact issues preclude summary judgment.

In support of their first argument—that justifiable reliance requires consideration of a variety of factors—Plaintiffs rely on *Bruschi v. Brown*, 876 F.2d 1526 (11th Cir.1989). In that case, the Eleventh Circuit held that, in the context of a Rule 10b–5 claim, an investor is not always precluded from recovering if the misrepresentations upon which he relied were oral and

---

**12.** Plaintiffs' arguments that they are entitled to summary judgment because they did not sign a release and because they did not endorse or deliver the note to Peninsula are without merit. With regard to the release issue, it is undisputed that Paul Garland executed a Contribution, Assignment, and Transfer Agreement and that this agreement states that he transfers all of his "right, title, and interest in and to, and all rights, entitlements, powers and privileges conferred under" the promissory note. Def. St. of Facts, Ex. I. With regard to delivery, the "[f]ulfillment of a contract promise... is not excused by failure of a condition which the promisor himself

causes to happen." *Ballard v. El Dorado Tire Co.*, 512 F.2d 901, 907 (5th Cir.1975). Because the Contribution, Assignment, and Transfer Agreement implies a promise that Paul Garland will indeed transfer all of his interest in the promissory note, he cannot void that contract simply by failing to deliver the note in an attempt not to fulfill that implied promise. Accordingly, if Paul Garland's transfer of the note was effective, which depends on the resolution of the factual issues mentioned above, any failure on the part of Plaintiffs to sign a release or to deliver the note is irrelevant.

conflict with contemporaneous written representations available to the investor. *Id.* at 1529. To determine justifiable reliance, then, requires the consideration of the following factors: (1) the sophistication and expertise of the plaintiff in financial and security matters; (2) the existence of longstanding business or personal relationships between plaintiff and defendant; (3) the plaintiff's access to relevant information; (4) the existence of a fiduciary relationship owed by defendant to plaintiff; (5) concealment of the fraud by defendant; (6) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (7) the generality or specificity of the misrepresentations. *Id.* As demonstrated, however, the court in *Bruschi* addressed federal securities fraud claims brought under Rule 10b–5, and this court has found no Florida state court decisions applying the *Bruschi* factors to claims brought under Fla. Stat. §§ 517.211 and 517.301.

Rather, the general rule under Florida law is that a party relying on a misrepresentation must show that it exercised some diligence for his or her own protection. *See, e.g., Fote v. Reitano,* 46 So.2d 891, 892 (Fla.1950); *Adams v. Prestressed Systems Indus.,* 625 So.2d 895, 897 (Fla. 1st DCA 1993). Florida law defines the due diligence standard as follows:

> The right to rely on a representation is closely related to the duty of the representee to use some measure of precaution to safeguard his own interest. In cases of this kind, assuming that the parties are not dealing in some fiduciary or confidential relation, the principle that the representee must exercise reasonable effort or diligence for his own protection will usually be applied, both in law and in equity.

*Adams,* 625 So.2d at 897. The measure of precaution necessary to justify reliance, however, is not the same for all tort actions based upon a material misrepresentation. Where the misrepresentation is made willfully or intentionally, "a recipient may rely on the truth of [the] representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him." *Besett v. Basnett,* 389 So.2d 995, 998 (Fla. 1980). According to the Florida courts, the aforementioned rule is premised on the notion that, while the law discourages both fraud and negligence, the latter is less objectionable than the former. *Id.* Where the misrepresentation is only made negligently, however, the recipient of the representation must reasonably investigate the truth or falsity of the representation for his reliance to be justifiable. While Florida law seeks to require full disclosure of all material facts, "[t]his does not mean ... that the recipient of an erroneous representation can hide behind the unintentional negligence of the misrepresenter when the recipient is likewise negligent in failing to discover the error." *Gilchrist Timber Co. v. ITT Rayonier, Inc.,* 696 So.2d 334, 339 (Fla.1997).

Applying these rules to the instant case, it appears that the Garlands have presented a fact issue as to whether they justifiably relied with regard to their fraudulent inducement claim, which is premised on Defendants' allegedly willful conduct. *See* Complaint, ¶ 79. While it is undisputed that the Garlands did not read most, if any, of the documents related to their investments, they testified that they did not receive several of the documents until after they had already invested. Moreover, Florida case law indicates that the Garlands may be excused from reading the documents. In *Thor Bear, Inc. v. Crocker Mizner Park, Inc.,* 648 So.2d 168 (Fla. 4th DCA 1994), for example, the court held that a jury question existed regarding whether the plaintiff's reliance was justifiable in light of the misrepresenter's position and presumed superior knowledge. *Id.* at 173. Plaintiff in that case, while negotiating a commercial lease, informed the lessor's vice-president that his business required quick ingress and egress as well as ample parking. The vice-presi-

dent, in turn, told the plaintiff that existing facilities already met those requirements and that, in any event, more paved parking space was to be added. Despite the fact that the plaintiff had observed the site facilities on several occasions during the negotiation period, as well as his subsequent concerns that the additional parking was not going to be built, the court held that a jury question was presented as to whether his reliance was justifiable because the misrepresenter was a vice-president of the lessor and was presumed to have superior knowledge about the facilities. *Id.; see also Wilson v. Equitable Life Assurance Society,* 622 So.2d 25 (Fla. 2d DCA 1993) (finding that plaintiff's reliance on oral misrepresentations might seem unreasonable in light of certain terms contained in written contract, but *Besett* rule precluded court from saying it was unreasonable as matter of law). In this case, the Garlands testified that they relied on statements made by Anderson, who was Vice–President and a director of Advance Textile, as well as a limited partner in Advance L.P., and who presumably had superior knowledge as to the subject matter of those statements. Accordingly, the court cannot say that the Garlands' failure to read the documents provided to them or to investigate Anderson's statements rendered their reliance unjustifiable as a matter of law, especially when they had no duty to investigate. Defendants' motion for summary judgment is therefore DENIED as to Plaintiffs' fraudulent inducement claim.

■ Plaintiffs' negligent misrepresentation claim, on the other hand, does not withstand scrutiny. As demonstrated, where the misrepresentations are made negligently, Florida law imposes a duty on the recipient reasonably to investigate the truth or falsity of the statements. *See Gilchrist,* 696 So.2d at 339. Because Plaintiffs admittedly did not read the documents, scrutinize the information provided by Anderson, or consult independent advisers, they have not reasonably acted so as to discover the errors and have not justifiably relied on the statements made

to them. *See Wasser v. Sasoni,* 652 So.2d 411, 413 (Fla. 3d DCA 1995) (finding that reliance was not justifiable where buyer of commercial property had ample opportunity to inspect the property and could have discovered alleged defects through the exercise of ordinary diligence).

Plaintiffs, however, argue once again that they were in a confidential relationship with Anderson, thereby excusing their due diligence obligations. The court finds this argument unpersuasive. Although the circumstances under which a confidential relationship may arise under Florida law are broader than under Georgia law, *see Van Woy v. Willis,* 153 Fla. 189, 14 So.2d 185, 190–91 (1943), the court finds that the Garlands have failed to demonstrate the existence of a confidential relationship even under Florida's broader standard. According to the *Van Woy* decision, the concept of a confidential relationship "embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another." *Id.* Despite this broad definition, it is clear that a close personal friendship does not create a confidential relationship under Florida law. *Butts v. Dragstrem,* 349 So.2d 1205, 1207 (Fla. 1st DCA 1977). As previously discussed, the Garlands have produced evidence of nothing more than a friendship with Anderson, coupled with business dealings unrelated to investments, which is simply insufficient to establish a confidential relationship. *See Morton v. Young,* 311 So.2d 755, 756–57 (Fla. 3d DCA 1975) (affirming finding that no confidential relationship existed where parties were casual acquaintances who saw each other socially and had conducted business unrelated to stock purchases). As a result, the court GRANTS Defendants' motion for summary judgment as to Plaintiffs' claims of negligent misrepresentation.

### E. *Other Motions*

In addition to the motions for summary judgment already discussed, the parties

have filed several other motions in this case. First, Plaintiffs have moved the court to strike the affidavit of Thomas Cottone attached to the motion for summary judgment filed by Defendants Advance L.P., Advance Corp., AMD, T. Cottone, and J. Cottone. Plaintiffs contend that the affidavit is based on "information and belief" and therefore is insufficient under Rule 56(e). Plaintiffs further contend that the affidavit directly contradicts T. Cottone's deposition testimony. Defendants, however, withdrew the motion on October 22, 1999, before the court considered the parties' motions for summary judgment or any of the evidence in support thereof. In light of this withdrawal, the court hereby DENIES as moot Plaintiffs' motion to strike the affidavit.

Plaintiffs, however, have also moved the court to strike the arguments of these Defendants in their motion for summary judgment and brief opposing Plaintiffs' motion for summary judgment that concern the insolvency of Advance Corp. and Advance L.P. Plaintiff maintains that these arguments are based on T. Cottone's affidavit, which was itself shown to be patently false in light of T. Cottone's testimony at a second deposition on October 7, 1999. Plaintiffs additionally move the court to impose sanctions on Defendants Advance L.P., Advance Corp., AMD, T. Cottone, and J. Cottone for filing a false affidavit. Because Defendants voluntarily withdrew the affidavit before the court considered their motion for summary judgment, rendering the arguments previously supported by the affidavit now unsupported by any evidence, the court DENIES Plaintiffs' motions to strike and for sanctions.

Finally, the motion filed by Defendants Advance L.P., Advance Corp., AMD, T. Cottone, and J. Cottone requesting a five-day extension of time to work out the details of certain proposed orders is hereby GRANTED.

## III. CONCLUSION

The motion for summary judgment filed by Defendants Advance L.P., Advance Corp., AMD, T. Cottone, and J. Cottone,

and the motion for summary judgment filed by C. Cottone, are DENIED [153–1, 155–1]. Plaintiffs' motion for partial summary judgment is also DENIED [150–1]. The court GRANTS in part and DENIES in part the motion for summary judgment filed by Defendants Anderson and Advance Textile [152–1]. The court GRANTS this motion with respect to Plaintiffs' FSIPA and negligent misrepresentation claims. The court DENIES this motion in all other respects. The parties are DIRECTED to submit to the court a pretrial order with regard to Plaintiffs' remaining claims within thirty (30) days from the date of this order.

Additionally, the court DENIES as moot Plaintiffs' motion to strike the affidavit of T. Cottone [192–1], DENIES Plaintiffs' motion to strike arguments related to insolvency and for sanctions [227–1, 227–2], and GRANTS Defendants' motion for an extension of time in which to work out the details of certain proposed orders [210–1].